IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EUROCHEM TRADING USA CORPORATION,

                Plaintiff,
  v.

W. KENT GANSKE, individually and
d/b/a and sole proprietor of AG CONSULTANTS,
and JULIE L. GANSKE,

                Defendants.

ORDER

W. KENT GANSKE, individually and d/b/a AG
CONSULTANTS, and JULIE GANSKE,

18-cv-16-slc

    Counter-Plaintiffs and Third-Party Plaintiffs,
and

WS AG CENTER, INC.,

                Third-Party Plaintiffs,
  v.

EUROCHEM TRADING USA CORPORATION,

                Plaintiff and Counter-Defendant,
and

EUROCHEM GROUP AG, SCOTT SIMON, IVAN
BOASHERLIEV, BENTREI FERTILIZER, LLC
and BEN-TREI, LTD.,

                Third-Party Defendants.

------------------------------------------------------------------------------------

Plaintiff EuroChem Trading USA Corporation ("ECTUS") is a wholesaler of fertilizer and other agricultural chemicals to customers in the United States. From 2012 to 2017, ECTUS sold product to one or more agri-businesses owned or controlled by W. Kent Ganske, a Wisconsin resident. In this lawsuit, ECTUS seeks to recover more than $14 million that it says W. Kent Ganske and his companies owe it for product that ECTUS delivered but for which it was never paid. ECTUS is suing W. Kent Ganske and his wife, Julie Ganske because it asserts that the Ganskes have breached their personal guaranty to pay this outstanding debt. ECTUS

is suing "W. Kent Ganske d/b/a and as sole proprietor of AG Consultants" for breach of contract, unjust enrichment, goods sold, accounts and accounts stated.

Defendants have counterclaimed for fraud in the inducement and misrepresentation in conjunction with the guaranty, and they seek declaratory judgment that certain claims are subject to arbitration,[1] and a declaratory judgment that the guaranty is invalid for lack of consideration. Defendants have requested punitive damages. Dkt. 14.

Before the court is ECTUS's motion under Fed. R. Civ. P. 64 and Wis. Stat. § 811.03 for issuance of a prejudgment writ of attachment against the property owned by the Ganskes and by W. Kent Ganske in his capacity as sole proprietor and d/b/a AG Consultants. Dkt. 40. ECTUS argues that preliminary relief is warranted because the debt owed by defendants was obtained by fraudulent statements by W. Kent Ganske. Defendants deny any fraudulent conduct, but assert that an attachment writ would be improper in any event because: (1) ECTUS waived its right to seek preliminary relief when it agreed not to seek a writ in a related arbitration action; (2) issuance of the writ would jeopardize the interests of defendants' secured creditors; (3) case law does not support the issuance of a writ under the facts alleged by ECTUS; and (4) a prejudgment writ would violate the 14th Amendment's guarantee of due process.

As I discuss below, defendants' legal challenges to the writ are unpersuasive. As for the alleged factual basis for a writ, ECTUS has made at least a colorable showing that it meets the criteria for the issuance of a prejudgment writ of attachment under Wis. Stat. § 811.03(1)(d). Although defendants' affidavits in opposition are largely conclusory and fail in many respects

---

[1] ECTUS contends, and the Ganskes do not dispute, that this claim is no longer at issue because the relevant parties have been dropped from the arbitration action.

2

to show a genuine dispute as to several material facts, defendants have put enough facts into dispute to warrant an evidentiary hearing, which the court will schedule with the parties' input.

DISCUSSION

I. Applicable Law

Rule 64 of the Federal Rules of Civil Procedure authorizes provisional remedies at the commencement of and during the course of an action for the purpose of securing satisfaction of the judgment ultimately to be entered in that action. Fed. R. Civ. P. 64; 11A Wright, Miller & Kane, Federal Practice and Procedure § 2931 (2d ed. 2005). The kinds of remedies and the circumstances under which they can be used are matters of state law. *Id*.

Wisconsin's attachment procedure is set forth in Wis. Stat. Ch. 811. Under the statute, a judge may issue a writ of attachment "on the request of the plaintiff at any time before final judgment and after a summons and a complaint are filed," Wis. Stat. § 811.02, provided that the plaintiff satisfies one of the statutory grounds set forth in Wis. Stat. § 811.03. ECTUS is proceeding under § 811.03(1)(d), which provides:

> (1) On contract or judgment. Before any writ of attachment shall be executed the plaintiff or someone in the plaintiff's behalf shall make and annex thereto an affidavit setting forth specific factual allegations to show that the defendant is indebted, or that property of the defendant is available, to the plaintiff in a sum exceeding $50 specifying the amount above all setoffs, and that the same is due upon contract or upon a judgment and that the affiant knows or has good reason to believe . . .
>
> (d) That the defendant fraudulently incurred the obligation respecting which the action is brought[.]

3

Thus, in order to obtain a writ pursuant to a contractual claim under § 811.03(1)(d), a party must present evidence that:

> (a) the party against whom attachment is sought is indebted or has property that is available to the party seeking attachment;
>
> (b) the claim of the party seeking attachment exceeds $50, specifying the amount owed above all setoffs; and
>
> (c) the party whose assets are to be attached fraudulently incurred the obligation for which the action is brought.

To satisfy this last requirement, the plaintiff must show, by clear and satisfactory evidence, that: (1) the party whose assets are to be attached made a statement of fact which was untrue; (2) it was made with intent to defraud and for the purpose of inducing plaintiff to act upon it; and (3) plaintiff did in fact rely upon it and was induced thereby to act to his damage. *W. H. Hobbs Supply Co. v. Ernst*, 270 Wis. 166, 169, 70 N.W.2d 615, 617 (1955) (citing *Larson v. Splett*, 267 Wis. 473, 66 N.W.2d 181 (1954)).

Although ECTUS opted to file a motion with notice to defendants, the statute permits a court to issue a writ *ex parte*. In the event a writ is issued and executed, the defendant may move "at any time" to vacate or modify the writ "for any sufficient cause," Wis. Stat. § 811.18, with the court to hold a hearing on such a motion "forthwith." Wis. Stat. § 811.19. The burden of proof lies with the plaintiff. *Id*. At least one court has interpreted the statute to require the plaintiff to show, in addition to the criteria above, a likelihood of success on the merits of the underlying action similar to that required by Fed. R. Civ. P. 65. *Select Creations, Inc. v. Paliafito America, Inc.*, 828 F. Supp. 1301, 1356-57 (E.D. Wis. 1992).

## II. Defendants' Preliminary Objections

Before addressing the parties' evidentiary submissions, it is necessary to consider defendants' global objections to ECTUS's motion. First, defendants argue that ECTUS somehow waived its right to seek preliminary relief in this action by agreeing to voluntarily withdraw its request for a prejudgment attachment in a pending arbitration proceeding between ECTUS and WSAG. In support, defendants have submitted emails exchanged between the parties and the arbitrator that memorializes an agreement reached by the parties in response to the arbitrator's conclusion that he lacked jurisdiction to decide whether the non-signatories (W. Kent Ganske and AG Consultants) were proper parties to the arbitration. *See* Exhs. 1 and 2 to Def.'s Opp. Br., dkt. 46. Under that agreement, ECTUS agreed that it would "not seek preliminary relief against WSAG in the arbitration" and would amend its pending federal court case to add AG Consultants and W. Kent Ganske as defendants on a claim based on liability on the invoices. *Id.*, exh.2.

These documents offer no support for defendants' claim that ECTUS agreed to forego a prejudgment writ of attachment against defendants in this case, a claim that ECTUS vehemently denies. Indeed, if, as defendants insist, "it was anticipated and agreed by the parties" that ECTUS would abandon its pursuit of prejudgment relief against *any* party in *any* forum, then one would have expected that term to have been included along with the other terms stipulated to by the parties in the arbitration proceeding. As defendants concede, that term is not there. Accordingly, this court has no basis on which to find that ECTUS knowingly and intentionally relinquished its right to seek a writ of attachment against the Ganskes in this federal court action. *See CHH Indus. Am. LLC v. Jones Lang LaSalle Americas, Inc.*, 882 F.3d 692,

5

711 (7th Cir. 2018)("Waiver entails the voluntary and intentional relinquishment of [a] known right.").

Second, defendants argue–without citing any legal authority–that issuance of the writ would jeopardize the interests of defendants' secured creditors by somehow permitting ECTUS to "leapfrog" ahead of defendants' secured creditors. Like defendants' first argument, this one is unfounded. As ECTUS points out, by law a prejudgment writ of attachment is subordinate to existing liens on personal property. *See* Wis. Stat. § 409.317(1)(b)1 (a lien creditor has priority only over an unperfected security interest); *Kepler v. Travelers Indem. Co.*, No. 98-35139-7, 2000 WL 33950020, at *3 (Bankr. W.D. Wis. Mar. 21, 2000) (under Wisconsin law, attaching creditor is treated as having a lien in the property when the creditor levies upon the attachment). Any security interests that were perfected prior to the execution of the writ would continue to have priority.

Third, defendants argue that "there is no authority" for a court to "impose[] a writ of attachment on a Wisconsin resident." Defs.' Opp. Br., dkt. 46, at 14. Defendants are wrong. Wis. Stat. § 811.03 does not limit its application to non-Wisconsin residents, and in fact, Wisconsin courts have issued writs of attachment against Wisconsin residents. *See, e.g., Schroeder v. Wacker*, 2000 WI App 116, 235 Wis. 2d 274, 616 N.W. 2d 524 (Ct. App. April 26, 2000) (Table) (unpublished disposition) (writ issued against Wisconsin resident); *Hobbs Supply*, 270 Wis. 166, 70 N.W. 2d 615 (trial court issued prejudgment writ of attachment against Wisconsin resident; court of appeals reversed trial court's finding that defendant incurred obligation by fraud). Further, ECTUS does not lose its motion merely because two federal cases it cites, *Select Creations, Inc. v. Paliafito America, Inc.*, 828 F. Supp. 1301 (E.D. Wis. 1992), and *Illumination Dynamics Co., Ltd. v. Pacific Lighting Solutions, L.L.C.*, No. 14-cv-613-wmc, 2014 WL 8795697

6

(W.D. Wis. 2014), involved facts different from this case. ECTUS would be entitled to a prejudgment writ of attachment if it satisfies the requirements of Wis. Stat. § 811.03(d); whether it can point to a reported case with identical facts is irrelevant.

Finally, defendants argue that a prejudgment writ would violate their right to due process. Defendants rest their argument on *United States General, Inc. v. Arndt*, 417 F. Supp. 1300 (E.D. Wis. 1976), in which the court held that a prior version of the Wisconsin attachment statute violated the Due Process Clause of the Fourteenth Amendment. Relying on a trio of Supreme Court cases scrutinizing state prejudgment remedies[2], the *Arndt* court ruled that Wisconsin's prejudgment attachment scheme was unconstitutional because it provided neither notice and hearing prior to the writ's issuance, nor "adequate alternative safeguards . . . to prevent mistaken seizures of property." *Id*. at 1312. The court found Wisconsin's attachment procedure deficient in the following respects: (1) it permitted the issuance of a writ on a conclusory supporting affidavit; (2) it permitted a writ to issue upon plaintiff's posting of a minimum bond of $250, which the court deemed wholly inadequate to assure the defendant had a reasonably adequate remedy in the event of a wrongful attachment; (3) it failed to provide a defendant with sufficient opportunity to obtain immediate relief from a wrongful issuance or execution of a writ; and (4) it specifically precluded a judge from considering whether the plaintiff was likely to succeed on the merits on the underlying claim. *Id*. at 1312-13.

As defendants acknowledge, the Wisconsin Legislature responded to the *Arndt* decision by amending the statute in 1977. *See* Wis. L., chap. 412, §§ 2-7. Although the statute still permits a judge to issue an attachment writ *ex parte,* the legislature added safeguards to diminish

---

[2] *See Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969), *Fuentes v. Shevin*, 407 U.S. 67, (1972), and *North Georgia Finishing Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975).

7

the possibility of a mistaken seizure. Specifically, in response to the defects noted above, the amended statute: (1) requires the plaintiff's affidavit to contain "specific factual allegations to show that the defendant is indebted to the plaintiff," Wis. Stat. § 811.03; (2) requires the issuing judge to set the plaintiff's bond at an amount "sufficient to provide adequate security to the defendant for any damages the defendant may sustain by reason of the attachment," Wis. Stat. § 811.06; (3) permits the defendant to move at any time to vacate or modify the writ "for any sufficient cause," Wis. Stat. § 811.18, requires the court to hold a hearing on such a motion "forthwith," and imposes the burden of proof on the plaintiff, Wis. Stat. § 811.19; and (4) contains no language expressly precluding the court from assessing the merits of the underlying claim.

Notwithstanding defendants' conclusory arguments to the contrary, these modifications seem adequate to address the *Arndt* court's concerns. Indeed, defendants have not cited to any case decided in the 40 years since the statute's amendment to suggest otherwise. In any event, this discussion is academic in this case because defendants received actual notice and an opportunity to be heard on ECTUS's request for a prejudgment writ of attachment. Further, as discussed in the next section, this court intends to hold an evidentiary hearing at which defendants may contest the propriety of the writ and, should the writ be issued, provide input on the appropriate bond amount to be posted by plaintiff. Thus, any claim by defendants that they have been deprived of due process is purely hypothetical. It is not a basis for denying ECTUS's writ application.

III. **The Parties' Evidentiary Submissions**

    A. **Facts Proffered by ECTUS**

Having rejected defendants' preliminary challenges, I turn to the merits of ECTUS's motion. Along with its motion for writ of attachment, ECTUS has submitted two declarations to meet the § 811.03 requirements: one from Ivan Boasher, ECTUS's former president and current commercial director, dkt. 40-1; and one from Patricia Aubort, a CPA and principal consultant for Avant Advisory Group, a firm that provides forensic, fraud and corporate investigations. Dkt. 40-2. These declarations allege the following:

ECTUS sold fertilizer and other agricultural chemicals to W. Kent Ganske, both individually and in his capacity as sole proprietor of and d/b/a AG Consultants. Boasher Aff., at ¶ 8. W. Kent Ganske is the sole shareholder of WSAG. *Id*. at ¶ 9. Boasher personally handled all of the orders for products purchased by W. Kent Ganske or his companies and he negotiated the contracts. *Id*. at ¶ 8.

In 2016, ECTUS and WSAG entered into a series of contracts ("the Contracts") for the sale and purchase of urea, phosphate and other products from ECTUS. *Id*. at ¶ 10. ECTUS's billing system required a certificate of good standing from the state in which the customer was incorporated, but AG Consultants did not have such a certificate because it was a sole proprietorship. For this reason alone, WSAG was set up as the "customer" in ECTUS's billing system. *Id*. at ¶¶ 9,10. However, W. Kent Ganske "acted at all times as if the Contracts were with AG Consultants," as evidenced by the following: checks given to ECTUS as payment for products were drawn on AG Consultants' bank accounts; the orders were placed by telephone by W. Kent Ganske d/b/a and as sole proprietor of AG Consultants on behalf of AG Consultants;

9

email correspondence received by ECTUS regarding the Contracts came regularly from AG Consultants' email addresses and from employees who indicated they were employees of AG Consultants; ECTUS delivered the products purchased pursuant to the Contracts to barge terminals owned or leased by AG Consultants in Illinois, Iowa and Wisconsin; ECTUS never delivered any products to WSAG's business location; and a forensic audit of WSAG's and AG Consultants' business records found that the products purchased from ECTUS were recorded as inventory on AG Consultants' books and not WSAG's books. *Id*. at ¶ 11.

Throughout their business relationship, ECTUS had offered WSAG and AG Consultants credit of up to 180 days, delivering product with subsequent invoicing and pricing. *Id*. at ¶ 12. Before extending this credit, ECTUS obtained Dunn & Bradstreet reports, which showed that WSAG and AG Consultants were good credit risks. *Id*. In early 2016, however, WSAG and AG Consultants began having problems meeting their payment obligations to ECTUS and asked ECTUS to relax its payment terms. *Id*. at ¶ 13. ECTUS granted three extensions—in March 2016, June 2016 and November 2016—and the parties amended the Contracts accordingly. *Id*. Before ECTUS granted these Payment Extensions, W. Kent Ganske told Boasher that WSAG's and AG Consultants' businesses were stable and doing well and that they would be able to comply with the new payment terms. *Id*. at ¶ 14.

In November 2016, Boasher received a credit report for WSAG and AG Consultants that revealed debts that W. Kent Ganske had not previously disclosed to ECTUS. *Id*. at ¶ 15. When Boasher asked W. Kent Ganske about the debts, Ganske denied owing them and said the credit report was not accurate. *Id*. Boasher accepted Ganske's representations and granted the third Payment Extension. *Id*. Under the terms of this extension, Ganske/AG Consultants/WSAG were to have paid the debts owed to ECTUS in full by May 31, 2017. *Id*. at ¶ 16.

But then in early 2017, W. Kent Ganske told Boasher that he/AG Consultants/WSAG would be unable to meet the May 31 repayment deadline. *Id*. Boasher told Ganske that ECTUS would not agree to another repayment plan until it had a better understanding of Ganske's financial situation, and he asked Ganske if Ganske would allow ECTUS to perform a forensic analysis of WSAG's and AG Consultants' financial records. According to Boasher, Ganske agreed. *Id*.

ECTUS retained Patricia Aubort of the Avant Advisory Group to perform the forensic investigation, which was conducted at WSAG's and AG Consultants' offices on March 20-24, 2017. Aubort Aff., dkt. 40-2, at ¶¶ 4, 5. During her visit, Aubort reviewed and analyzed WSAG's and AG Consultants' financial records, including their internal accounting and bank records, and she interviewed the companies' employees, outside accountants and bookkeepers. *Id*. at ¶ 5. Aubort also interviewed Ganske. *Id*. Aubort's investigation discovered "extreme financial irregularities" in the records and practices of the two companies, including but not limited to the following: (1) WSAG and AG Consultants maintained two sets of accounting records, commingled assets amongst themselves and other entities and properties owned and controlled by Ganske and had approximately $30 million of debt in excess of assets, with over $9 million of this debt secured; (2) the companies did not observe corporate formalities, but instead commingled their accounts and did not reconcile intercompany transactions; (3) they used prepayments made by customers for product to fund operations and to pay other liabilities, *i.e.*, "robbed Peter to pay Paul"; (4) they treated customer prepayments as a negative asset rather than a liability on the companies' books, and used an "unexplained and unreconcilable adjustment called 'incoming AR from Peachtree'" to artificially hide the negative net accounts

receivable balance; (5) they delayed paying vendors, had unusual float levels in the purchase of assets and had potential concealment of losses; and (6) AG Consultants had no inventory tracking or valuation and sometimes its inventory was recorded on the books of WSAG for "reporting purposes," which included documents submitted to banks for loan transactions. *Id*. at ¶¶ 6-13.

AG Consultants and WSAG had not disclosed these irregular practices to ECTUS; to the contrary, they had concealed them in order to induce ECTUS to sell large quantities of product on extended credit terms. Boasher Aff., dkt. 40-1, at ¶ 18. If ECTUS had known of these irregularities, then it would not have entered into the Contracts or the Payment Extensions with AG Consultants or WSAG, nor would ECTUS have sold any fertilizer to the companies on deferred payment terms. *Id*. at ¶19.

In March 2017, W. Kent Ganske provided Boasher with a document that showed that Ganske and AG Consultants had almost $23 million of debt that Ganske had not previously disclosed to ECTUS. *Id*. at ¶ 20. This debt resulted from prepayments made to Ganske by customers for future deliveries. *Id*. When Boasher learned of the debt, he realized that Ganske had misled ECTUS about his ability to repay the debt he owed to ECTUS. *Id*.

In March and May 2017, W. Kent Ganske and J. Ganske, respectively, executed a Continuing Guaranty (Unlimited), guarantying payment of all obligations of WSAG and AG Consultants due and owing to plaintiff ECTUS. *Id*. at ¶ 21. The total amount owed to ECTUS is $14,285,215.27, plus interest, liquidated damages and attorneys' fees and costs. *Id*. at ¶ 22.

**B. Facts Proffered by Defendants**

In opposition to the writ of attachment, defendants have submitted four affidavits: two from W. Kent Ganske (dkts. 46-8 & 49); one from Marc Farmer, WSAG's outside accountant (dkt. 48); and one from Carolyn Bauman, Farmer's office assistant (dkt. 47). Ganske admits that ECTUS and WSAG entered into a number of contracts for products in 2016, that these contracts were amended to reflect extended payment terms and that the terms of these contracts have not been met. He avers, however, that he entered into these contract terms based on Boasher's verbal assurances that he would "make things right" with Ganske and credit WSAG's account later. Supp. Aff. of W. Kent Ganske, dkt. 46-8, at ¶¶ 22-24. According to Ganske, WSAG experienced a number of problems with ECTUS, including product containing large foreign materials that caused damage to equipment, untimely shipments, and delivery of product that WSAG did not need. *Id*. at ¶¶ 37-46. When Ganske brought these issues to Boasher's attention, he would repeatedly tell Ganske that ECTUS would "take care of you," which Ganske understood to mean that WSAG's charges would be zeroed or reduced. *Id*. at ¶¶ 42, 46. Ganske denies owing more than $14 million to ECTUS, asserting (without evidentiary support) that when all of ECTUS's promised credits and adjustments are accounted for, ECTUS actually will *owe* defendants money. Def.'s Br. in Opp. dkt. 46, at 8, ¶ 19.

Ganske denies that he fraudulently misrepresented his financial situation to ECTUS, and avers that when ECTUS asked about a specific creditor, he provided true and accurate information to ECTUS regarding the status of such debt. Aff. of W. Kent Ganske, dkt. 49, at

13

¶¶ 8,9. With respect to Aubort's findings[3], Ganske denies that there was any commingling of funds or any "concerted misconduct" by him or his companies, dkt. 48-6, ¶¶ 63, 84, and avers that the IRS performed comprehensive audits in 2011 and 2015 and found "no evidence of commingling or wrongdoing." *Id*. at ¶ 59. However, while insisting that "significant accounting formalities were observed" with respect to WSAG and AG Consultants, Defs.' Br. in Opp., dkt. 46, at 7, ¶ 11, Ganske, Farmer and Bauman do not deny that:

- WSAG and AG Consultants had $30 million debt in excess of assets;

- the companies did not reconcile their multiple sets of accounting records;

- WSAG/AG Consultants used customer payments for expenses, including to acquire inventory;

- these customer prepayments were treated as a negative asset rather than a liability;

- a $43 million unexplained and unreconcilable adjustment called "incoming AR from Peachtree" artificially hides the negative net accounts receivable balance;

- WSAG/AG Consultants delayed paying vendors, had unusual float levels in the purchase of assets and potential concealment of losses; and

- AG Consultants had no inventory valuation or tracking.

Ganske admits that he and his wife signed a personal guaranty in 2017 under which they agreed to pay all obligations of WSAG and AG Consultants due and owing to plaintiff ECTUS. He avers, however, that he and his wife were induced into signing the guaranty by ECTUS's representatives, who made specific promises that have not been kept. Ganske Aff., dkt. 46-8, ¶ 87.

---

[3] In his affidavits, Ganske denies giving Aubort permission to perform a complete financial analysis of his companies' records and says he was misled about the reason she was doing so. Dkt. 48-6, ¶¶ 55-56; Dkt. 49, ¶¶ 5, 6.

## C. An Evidentiary Hearing is Necessary

There is no question that ECTUS has satisfied the first two requirements for obtaining a prejudgment writ under § 811.03(1)(d). As detailed above, Boasher's affidavit shows that Julie Ganske and W. Kent Ganske signed a personal guaranty in which they agreed to pay the outstanding debts of WS AG Center, Inc. and Agricultural Consultants, and that the amount of that debt exceeds $14 million. ECTUS has also made at least a preliminary showing that it is likely to prevail on the merits of its underlying claim against the Ganskes for breach of the personal guaranty, insofar as defendants admit that they signed it and have not (yet) produced evidence to support their claim of fraudulent inducement.

Two other issues are more clearly disputed, both relating to ECTUS's burden of showing that "the party whose assets are to be attached fraudulently incurred the obligation for which the action is brought." Wis. Stat. § 811.03(1)(d). The first issue is whether W. Kent Ganske committed fraud on ECTUS. According to ECTUS, "K.Ganske and K. Ganske in his capacity of sole proprietor of and d/b/a AG Consultants misrepresented their financial situation in order to induce ECTUS to extend credit to them and agree to the Payment Extensions." Dkt. 40, at 11. ECTUS points to two statements by Ganske that it characterizes as false: (1) Ganske's statement to Boasher that "WSAG's and AG Consultants' businesses were stable and that their businesses were doing well;" and (2) Ganske's denial in November 2016 that he owed certain debts shown on a credit report that had not been previously disclosed to ECTUS. *Id*. Thus, the

15

"obligation" that ECTUS says was fraudulently incurred were the Payment Extensions granted in March, June and November 2016.[4]

ECTUS's evidence in support of its fraud claim is not overwhelming. Without more, Ganske's statement that his businesses were "stable" and "doing well" arguably is a statement of opinion, not fact. *See, e.g., Consolidated Papers, Inc. v. Dorr–Oliver, Inc.*, 153 Wis. 2d 589, 594, 451 N.W. 2d 456 (Ct. App. 1989) ("A representation is one of opinion if it expresses only the maker's judgment as to quality, value, authenticity, or other matters of judgment."). Moreover, it is not clear from ECTUS's proffered evidence that Ganske knew this statement was false when he made it. Ganske's second statement, in which he denied owing certain debts on a credit report, is closer to the mark. Nonetheless, ECTUS will have to identify those debts more specifically and show that Ganske knowingly lied about those debts (in addition to proving the other elements of misrepresentation) in order to establish fraud and obtain a writ.

The second issue to be addressed at the hearing is whether ECTUS can obtain a writ of attachment against the Ganskes' property, including W. Kent Ganske's sole proprietorship, AG Consultants, when the debtor named on the obligations alleged to have been incurred by fraud was WSAG, a corporate entity. Although ECTUS argues that proceeding against the Ganskes'

---

[4] Although not contested by defendants, I note that the term "obligation" encompasses not just the underlying debt but "to pay the terms of the contract made concerning the debt." *Wachter v. Famechon*, 62 Wis. 117, 22 N.W. 160, 162 (1885). In *Wachter*, 22 N.W. at 160, 162, the Wisconsin Supreme Court held that where the debtor obtained an increased term of credit by representing "that he was perfectly good, and that his property was clear from incumbrance, with no mortgage or anything upon it; that he did not owe a great deal; and that the plaintiff's debt was as large as any he had," when in reality he had debt far in excess of his assets and was grossly insolvent, the trial court had erred in dismissing a writ of attachment. Thus, even though ECTUS does not contend that W. Kent Ganske fraudulently incurred the original Contracts, it may obtain an attachment writ if it can show that the Payment Extensions were obtained by fraud.

16

property is proper because the Ganskes are on the hook for WSAG's debt by virtue of the guaranty, ECTUS does not suggest that the *guaranty* was fraudulently obtained; rather, the fraud occurred before the guaranty was signed, when ECTUS allegedly was duped into granting Payment Extensions to WSAG by W. Kent Ganske's false representations about the company's ability to pay. Under the plain language of the statute, ECTUS is not entitled to a writ of attachment against the Ganskes' property solely by virtue of the guaranty because ECTUS does not contend that the guaranty was procured by fraud.

Taking a different tack, ECTUS argues that it is proper to attach the property of the Ganskes and AG Consultants because AG Consultants had an implied contract with ECTUS, insofar as AG Consultants received and accepted the benefit of product shipped and delivered to it by ECTUS. Plt.'s Br., dkt. 40, at 9. This argument does not have much traction. Although ECTUS now argues that it had an implied contract with AG Consultants for the shipment and delivery of product, ECTUS does not deny that it had express contracts with WSAG covering the same shipments and deliveries. Indeed, ECTUS is pursuing recovery from WSAG on these contracts in the arbitration proceeding.

As defendants point out, it is well-settled that "[w]here a valid express contract is proven no recovery can be had on an implied contract." *Schultz v. Andrus*, 178 Wis. 358, 361, 190 N.W. 83 (1922). Although ECTUS insists this rule applies only when the express and implied contracts are between the same parties, it cites no authority for this proposition other than the negative implication it draws from defendants' cited cases. Absent more persuasive authority from ECTUS, I share defendants' view that there can be only one contract: either an express

17

contract between ECTUS and WSAG or an implied contract between ECTUS and AG Consultants, but not both.

This does not mean ECTUS is out of luck. Although not explicitly argued in its brief, ECTUS has proffered facts suggesting that this might be an appropriate situation to disregard the corporate entity named on the contracts and find that AG Consultants is the alter ego of WSAG, as ECTUS alleges in Count V of the Second Amended Complaint. Dkt. 31, at 13. In Wisconsin, the "instrumentality" or "alter ego" doctrine requires proof of the following elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-op. of Walworth Cty. v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d 211, 217–18 (1988).

As detailed above, ECTUS has presented evidence that AG Consultants controlled and dominated the finances and business practices with respect to the purchase of goods from ECTUS that were the subject matter of the Contracts and Payment Extensions; WSAG and AG Consultants mingled assets and accounts and ignored corporate formalities; and AG Consultants used its control over WSAG to commit fraud on ECTUS. ECTUS's affidavits are sufficient to make out at least a *prima facie* case for piercing the corporate veil and finding that WSAG and

AG Consultants are one and the same.  I leave it to the parties to address this issue in more detail at the evidentiary hearing.[5]

IV.     **Defendants Have Not Shown They are Entitled to An Attachment Writ Against ECTUS**

Finally, defendants assert that if this court issues a prejudgment writ of attachment against them, then it should also issue one against ECTUS.  Defs.' Br. in Opp. dkt. 46, at 20-21.  This request must be denied.  Under Wis. Stat. § 811.03(2), a party applying for a prejudgment writ of attachment in a tort action must file an affidavit specifying the amount claimed.  Defendants have not filed any affidavits specifying the amount of damages they claim from ECTUS on either their counterclaim or third-party complaint, which sound in tort.  *See Select Creations*, 828 F. Supp. at 1357 (denying prejudgment writ of attachment when party failed to present a clear account of debt owed).  Absent compliance with the statutory requirements, this court cannot and will not consider defendants' offhand request for an attachment writ.  Only ECTUS's application is properly before the court.

---

[5] Having raised the corporate alter ego doctrine, let me now question its efficacy in light of the ongoing arbitration between ECTUS and WSAG.  If this court were to decide to disregard the corporate entity and find AG Consultants to be the alter ego of WSAG, would this lawsuit have to be stayed in favor of the arbitration? The court welcomes the parties' input on this question.

ORDER

IT IS ORDERED THAT:

(1) Defendants' preliminary objections to the issuance of a prejudgment writ of attachment are DENIED for the reasons stated in this order.

(2) Not later than August 3, 2018, each side will file its own report presenting their predictions on whether this will be a one-day or a two-day evidentiary hearing on plaintiff's request for a writ, the witnesses they would intend to call, and a proffer of the evidence they would attempt to adduce from each witness.

(3) The court is available for the evidentiary hearing on August 17, August 20, August 27, August 31, September 4, September 5, September 10 or September 11, 2018. (Note that August 17 and August 31 only work if the hearing will be finished in one day.) In their August 3 submissions the parties are to report their availability and their preferences. The court then will promptly schedule the hearing.

Entered this 27th day of July, 2018.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge