IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EUROCHEM TRADING USA CORPORATION,

    Plaintiff,

 v.

W. KENT GANSKE, individually and
d/b/a and sole proprietor of AG CONSULTANTS,
and JULIE L. GANSKE,

    Defendants.

OPINION AND ORDER

W. KENT GANSKE, individually and d/b/a AG
CONSULTANTS, and JULIE GANSKE,

18-cv-16-slc

 Counter-Plaintiffs and Third-Party Plaintiffs,

and

WS AG CENTER, INC.,

    Third-Party Plaintiffs,

 v.

EUROCHEM TRADING USA CORPORATION,

    Plaintiff and Counter-Defendant,

and

EUROCHEM GROUP AG, SCOTT SIMON, IVAN
BOASHERLIEV, BENTREI FERTILIZER, LLC
and BEN-TREI, LTD.,

    Third-Party Defendants.

_____

  Plaintiff EuroChem Trading USA Corporation ("ECTUS") brings this lawsuit to collect more than $14 million in unpaid invoices for agricultural product that it delivered to WSAG Center, Inc. ("WSAG"), an agri-business controlled by defendant W. Kent Ganske. It sued Ganske and his wife, Julie Ganske, for breach of contract, alleging that they signed an unconditional Guaranty in which they agreed to pay WSAG's debts to ECTUS. The Ganskes, joined by WSAG, filed a number of counterclaims, including fraud in the inducement and misrepresentation by ECTUS in conjunction with the Guaranty.

While this lawsuit has been pending, ECTUS and WSAG have arbitrated their dispute over the unpaid invoices. On March 6, 2019, the arbitrator issued a Final Award, awarding ECTUS damages in the amount of $14,283,519.42 for breach of contract, plus pre-judgment interest, attorneys' fees, and costs. Dkt. 80-1. In an order entered on July 8, 2019, this court affirmed the Final Award. Award in hand, ECTUS now asks this court to enter summary judgment against the Ganskes on Count IV of the second amended complaint, which seeks to collect on the Guaranty. Dkt. 90.

The Ganskes do not deny that they signed the Guaranty or that they have breached it, but they allege that the Guaranty is unenforceable because they were fraudulently induced into signing it and because it was not supported by adequate consideration. Dkts. 98-104. Specifically, W. Kent Ganske and Julie Ganske each contends that he/she signed the Guaranty only because ECTUS's representatives promised him/her certain things, knowing that those promises were false. ECTUS's representatives flatly deny making any binding promises on behalf of the company or that they had any fraudulent intent.

Although it is highly unlikely that the Ganskes will be able to establish all the necessary elements of their fraud claim at trial, the evidence they have presented to the court is enough to stave off summary judgment. Implausible though some of their assertions may be, on summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. Accordingly, although it is a close call, I am denying ECTUS's motion for summary judgment against the Ganskes. I will decide this portion of the parties' dispute at the imminent bench trial. More on this at the end of the order.

A procedural matter requires mention before setting out the facts: the Ganskes argue that the summary judgment motion is premature, reporting that they are awaiting responses to some

of their discovery requests. They also suggest that they did not undertake discovery in a more timely fashion because they were awaiting the court's ruling on a motion to dismiss by third-party defendant Scott Simon. Although the Ganskes have not filed any motion to this effect, they appear to be asking the court to reset the summary judgment deadline.

The Ganskes' objections are not well taken. The pretrial conference order establishing the deadlines in this case was issued over 16 months ago, on April 2, 2018. Plaintiff filed its summary judgment motion on April 25, 2019, one day before the dispositive motion deadline expired, so it is hardly "premature." The pretrial conference order alerted the parties then that they "are to undertake discovery in a manner that allows them to make or respond to dispositive motions within the scheduled deadlines," dkt. 26 at 2, and that they were to file discovery motions promptly if they ran into unresolvable disputes, *id.* at 3. No party ever requested a stay of discovery and no stay has been issued. Moreover, it is puzzling and illogical for the Ganskes to have waited to take discovery from ECTUS until they knew whether Simon was in the case. The third party claims against him have nothing to do with ECTUS's collection action on the Guaranty. Accordingly, the Ganskes' informal, post-hoc request for a new summary judgment deadline is denied.

For the purposes of deciding the pending motion, the court finds the following facts to be relevant and material.[1] They are undisputed except where otherwise noted.

---

[1] The Ganskes have proposed a number of irrelevant facts in support of defenses to the underlying debt owed by WSAG. *See, e.g.* Def.'s PFOF, dkt. 100, Nos. 4-7, 13-17, 19-27. The validity and amount of the debt was determined in the arbitration proceeding and confirmed by this court's July 8, 2019 order. It is not at issue on summary judgment.

FACTS

**I. The Parties**

Plaintiff EuroChem Trading USA Corporation ("ECTUS") is incorporated under the laws of the State of Florida and has its principal place of business in Tampa, Florida. ECTUS is a wholesaler of fertilizer and other agricultural chemicals to customers in the United States. From 2012 to 2017, ECTUS sold product to one or more agri-businesses owned or controlled by W. Kent Ganske.

W. Kent Ganske (Ganske) and his wife, Julie Ganske, are citizens of Wisconsin. Ganske is the sole shareholder of WS AG Center, Inc., an agricultural product retailer. WSAG is incorporated and has its principal place of business in Wisconsin. Ganske also owns and operates Agricultural Consultants (AG Consultants) as a sole proprietorship.

**II. The Contracts**

Beginning in 2010, ECTUS and WSAG entered into a series of contracts for the sale of urea, phosphate and other products from ECTUS to WSAG. This case concerns nine contracts entered into between December 9, 2015 and November 18, 2016 ("the Contracts"). ECTUS timely delivered goods as provided in the Contracts, WSAG accepted delivery, and ECTUS provided invoices to WSAG for all amounts due and owing. However, in early 2016, WSAG fell behind on its payments. By November 2016, WSAG owed ECTUS more than $21 million.

On or about November 16, 2016, ECTUS agreed to a payment schedule with WSAG for repayment of all amounts due not later than May 31, 2017, and the parties executed Addendums to the Contracts to this effect. However, in January 2017, Ganske informed ECTUS that WSAG

would not be able to repay the entire debt by May 31, 2017, as it had promised. At that time, WSAG's debt to ECTUS stood around $14 million. ECTUS thereafter continued to sell product to WSAG, but only on a prepayment basis.

**III. The Guaranty**

On March 7 through 9, 2017, Ganske held meetings with Ivan Boasher, ECTUS's president, and Marc Hechler, the head of European marketing and sales for ECTUS's parent company, EuroChem Group AG, to discuss resolution of WSAG's debt. Julie Ganske was not present at these meetings. One of ECTUS's goals during these meetings was for Ganske and Julie Ganske each to sign a personal guaranty for the debt owed by WSAG.

The parties dispute precisely what was said during the meetings. According to Boasher and Hechler, in exchange for signing the Guaranty, Ganske wanted ECTUS to agree to resume selling products to WSAG on a deferred payment basis. Boasher and Hechler say they rejected this proposal, informing Ganske that he would have to continue to prepay if he wanted product from ECTUS. According to Boasher, ECTUS would not have continued to sell product to Ganske under *any* circumstances, even with prepayment, without the Guaranty. Although Boasher and Hechler agree that they discussed *possibly* entering into an agreement for WSAG or Ganske to sell ECTUS's products on a controlled consignment basis, both men aver that they expressly told Ganske that any proposals discussed would have to be approved by EuroChem's upper management, and that neither of them had the authority to agree to specific proposals on behalf of ECTUS. Hechler and Boasher state that they also discussed how Ganske could support

5

his business during the summer of 2017, so that when his busy season was over, he could try to sell his business to repay his debt to ECTUS.

Ganske, on the other hand, avers that Hechler and Boasher told him that, if he signed the Guaranty, then ECTUS would immediately begin to supply WSAG with product on a "controlled consignment basis," a type of credit arrangement under which ECTUS would provide product to WSAG but retain a portion of the proceeds. Ganske further avers that Hechler and Boasher told him that ECTUS would eventually purchase WSAG. Ganske understood that Boasher and Hechler had authority to make these representations based on their positions at their respective companies. Aff. of W. Kent Ganske, dkt. 103, ¶ 58.

Ganske signed the Guaranty on March 8, 2017. It states, in relevant part:

> For value received, and to induce **EuroChem Trading USA Corporation** ("Creditor"), to continue credit accommodations to W S AG Center, Inc. and Agricultural Consultants (collectively, "Debtor"), the undersigned Guarantor jointly and severally guarantees payment of the Obligations defined below when due or, to the extent not prohibited by Law, at the time any Debtor becomes the subject of bankruptcy or other insolvency proceedings.

Later that day, Ganske sent the following email to Boasher and Hechler:

> I'm writing this as a follow up e-mail to our conversations over the past two days that led me to sign the personal guaranty today. I was reluctant to sign the guaranty, but based on your representations I was willing to sign with the understanding based on your promises that Eurochem will be providing me with a written agreement setting forth the details for WS Ag's payoff of its indebtedness. I was willing to provide the guaranty with the understanding Eurochem has agreed to provide WS the following payment terms: $500,000 paid on or before 3/17/2017, $500,000 paid on or before 3/31/2017, the balance of $6,700,000 paid by 12/31/2017, $3 million of that paid in the fall months. Also starting in July 2017 I would start consideration of the process of putting my business up for sale.

> The remainder of $6,700,000 would be paid by 12/31/2018, with $1 million of that being paid by 7/31/2018. At that time or anytime we would discuss selling some or all the assets of the company. Also part two is your organization providing us product on a controlled, consignment basis that we outlined over the past day and today. I understand I can expect a draft of these agreements on Friday.

In an email response sent later that day, Hechler agreed that Ganske's email "basically reflects" what the parties had discussed at their meetings. Hechler further indicated that Eurochem intended to draft two separate agreements: (1) a "'Master sales agreement' outlining the key principles of a controlled consignment agreement;" and (2) a "Memorandum of Understanding on the revised debt repayment plan including certain conditions we discussed regarding the asset sales process". Hechler represented that Eurochem planned to have the first document prepared by Friday and the second by early the following week.

After returning from their meeting with Ganske, Boasher and Hechler presented the proposed repayment plan to EuroChem management, including its CFO and CEO. EuroChem's management responded that they would not agree to anything until they had a better understanding of Ganske's and WSAG's financial situation.[2] On March 10, 2017, Hechler sent an email to Ganske stating that he had "had a first discussion with the Group CEO and CFO on the revised payment plan and concept on how to operate going forward," and that "management needs additional **up-to-date** information with regards to your current asset and liability

---

[2] Ganske denies this, citing generally to paragraphs 51-72 of his affidavit. None of those paragraphs contains any admissible evidence that refutes ECTUS's assertion that its upper management team was unwilling to enter into a consigned credit arrangement or a deferred payment plan until it had a better picture of Ganske's finances. *See* Ganske Aff., dkt. 103, ¶¶ 51-72. Accordingly, this fact is undisputed.

7

situation." In addition, Boasher and Hechler asked Ganske to allow ECTUS to retain an accountant to review his companies' financial records. Ganske agreed.[3]

Avant Advisory Group performed an accounting review of the books and records of WSAG and K. Ganske d/b/a/ AG Consultants. The results were unfavorable to Ganske. The accountant found extreme financial irregularities, including commingling of assets, multiple accounting records, and debt that exceeded assets by $30 million.[4] In addition, at a meeting with Boasher, Hechler, and the accountant on March 20, 2017, Ganske provided a document showing that he and his companies had almost $23 million of previously undisclosed debt in the form of prepayments from customers for future deliveries.[5]

After receiving this information, ECTUS refused to enter into any agreement with Ganske or WSAG for the controlled consignment sale of products. However, it continued to have discussions with Ganske about a plan for repaying WSAG's debt to ECTUS. ECTUS also continued to supply product to Ganske on a pre-payment basis until October 2017.

---

[3] Ganske does not deny that he allowed the outside accountant to review his financial records, but asserts that he did so only for "business valuation purposes."

[4] Ganske denies that the accountant's report was accurate. Def.'s Resp. to PPFOF, dkt. 99, No. 29. In support, he cites to his affidavit and to the affidavit of Michael Schwantes, who prepared business valuations of Ganske's companies in 2016 and 2018. Ganske's own affidavit offers only the vague and conclusory assertion that the accountant's report was "inaccurate," which is insufficient to put this fact into dispute. Aff. of W. Kent Ganske, dkt. 103, ¶ 68.
As for Schwantes's business valuation reports, Schwantes says that they "fairly value[] the assets and goodwill" of Ganske's businesses and were prepared at Ganske's request. Aff. of Michael Schwantes, dkt. 102, ¶¶ 6,8. However, Schwantes does not say what information he reviewed to prepare his reports. More importantly, he does not offer any specific critique of Avant's report. Accordingly, Ganske's general contention that the Avant report is "inaccurate" is not enough to put that fact into dispute.

[5] Ganske says Boasher knew about these prepayments, Ganske Aff., dkt. 103, ¶ 68, but he does not offer proper foundation for this assertion.

Ganske claims that in May 2017, he spoke with Boasher and asked him if he would provide WSAG with product on credit. Ganske avers that Boasher promised that if Ganske's wife, Julie Ganske, signed the Guaranty, then ECTUS would give WSAG a credit line of $1 million. Ganske and Julie Ganske both aver that Ganske repeated Boasher's assurances to Julie Ganske, that she relied on those assurances in signing the Guaranty on May 10, 2017, and that after she signed it, Boasher reneged on his promise.

Boasher, on the other hand, denies ever telling Ganske that ECTUS would extend further credit to him or WSAG. According to Boasher, selling more product to Ganske or WSAG on credit was not an option, given the significant debt already owed to ECTUS.

No one from ECTUS ever made any representations directly to Julie Ganske.

## ANALYSIS

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000). The court must avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

9

The Ganskes do not dispute that confirmation of the arbitration award establishes a debt owed by WSAG to ECTUS. They do not dispute that they guaranteed payment of that debt when they executed and delivered the Guaranty to ECTUS on March 8, 2017 (K. Ganske) and May 10, 2017 (J. Ganske). They do not dispute that they have not paid the debt and therefore are in breach of the Guaranty. They do not dispute that ECTUS has been damaged as a result of the Ganske's breach. *See FirstMerit Bank, N.A. v. Weinkauf*, 2014 WL 145232, *2 (W.D. Wis.), *partially vacated on other grounds*, 2014 WL 12543053 (W.D. Wis. 2014) (elements of breach of guaranty are (1) the existence of a guaranty contract creating obligations flowing from defendant to plaintiff; (2) breach or failure to honor the guaranty; and (3) damages flowing from the breach).

Instead, the Ganskes contend that the Guaranty is invalid and unenforceable because ECTUS fraudulently induced them to sign it and because it was not supported by adequate consideration.

**I. Fraudulent Inducement**

To establish that they were fraudulently induced to execute the Guaranty, the Ganskes must prove that

1) ECTUS made a representation of fact;

2) The representation of fact was false;

3) The Ganskes believed and relied on the misrepresentation to their detriment or damage;

4) The misrepresentation was made by ECTUS with knowledge that it was false, or recklessly without caring whether it was true or false; and,

> 5) The misrepresentation was intended to deceive the Ganskes and to induce them to act on it to their detriment or damage.

*Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis.2d 146, 157, 677 N.W.2d 233 (contract fraudulently induced is void or voidable). In addition, the Ganskes must show that "the fraud is extraneous to, rather than interwoven with the contract," *Kaloti Enterprises, Inc. v. Kellog Sales Co.*, 2005 WI 111, ¶ 42, 283 Wis. 2d 555, 585 (Wis. 2005), and that their reliance on the misrepresentation was reasonable. *Kailin v. Armstrong*, 2002 WI App 70 ¶ 31, 252 Wis.2d 676, 702, 643 N.W.2d 132, 146.

Kent Ganske avers that he signed the Guaranty in reliance on three representations made by Boasher and Hechler that turned out not to be true:

1. ECTUS would extend payment terms on the outstanding debt;

2. ECTUS would deliver product on a consignment basis; and

3. ECTUS would purchase Ganske's businesses and assets.

Br. in Opp, dkt. 98, at 4-5. The first of these is not actionable because it is interwoven with the contract. A guaranty is a contract "'to become responsible for the fulfillment of an agreement of another, to secure, to answer for the debt, default, or miscarriage of another.'" *KleinDickert Oshkosh, Inc. v. Frontier Mortgage Corp.*, 93 Wis.2d 660, 668, 287 N.W.2d 742, 746 (1980) (quoting *Mann v. Erie Manufacturing Co.*, 19 Wis.2d 455, 459, 120 N.W.2d 711, 714 (1963)). A fraud is "extraneous" to the contract when it "concerns those matters whose risk and responsibility were not expressly or impliedly dealt with in the contract." *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 47, 262 Wis. 2d 32, 52, 662 N.W.2d 652, 662. The Guaranty expressly states that it was provided in exchange "For value received, and to induce **EuroChem**

**Trading USA Corporation** ('Creditor'), to continue credit accommodations to W S AG Center, Inc. and Agricultural Consultants (collectively, 'Debtor'[.]" Thus, insofar as the Ganskes are alleging that they signed the Guaranty in reliance on ECTUS's representations that it would not demand immediate payment on the large debt owed by WSAG and Agricultural Consultants but instead would attempt to work out a payment plan, those representations are interwoven with the contract and not actionable.

But the remaining two representations are not related to the Ganske's payment of WSAG's preexisting debt under the Guaranty. They contemplate a separate, future arrangement between the parties. Accordingly, I agree with the Ganskes that these representations are not interwoven with the contract and therefore may be the subject of a fraudulent inducement claim.

I further conclude that enough questions remain concerning exactly what Boasher and Hechler told Kent Ganske during their meetings on March 7-9 to preclude summary judgment in favor of ECTUS. Kent Ganske insists that, contrary to what Boasher and Hechler have said, the promises they made about entering into a controlled consignment agreement and buying WSAG's assets were not preliminary or contingent on obtaining approval from ECTUS's upper management.

I am skeptical of Ganske's carefully-worded recollection of the meeting in which he does not deny that Boasher and Hechler told him they lacked authority to make any final agreements until they had approval from ECTUS's upper management. Even so, Ganske avers that: (1) he understood, based on the mens' respective positions at their companies, that they had binding authority, Ganske Aff., dkt. 103, ¶58; (2) they promised that ECTUS would "immediately" begin consignment sales if he signed the Guaranty, ¶60; (3) Hechler confirmed in his email that

12

Ganske's recitation of the parties' discussions that led to his signing the Guaranty was "basically" correct, ¶65; (4) Boasher "mischaracterized" what happened at the March 7-9 meetings, ¶78; and (5) the agreements that Hechler promised to send were not represented to be conditional, *id*. Giving Ganske all benefit of the doubt, as I must at the Rule 56 stage, his sworn testimony is enough from which a reasonable fact-finder might be able to infer that Boasher and/or Hechler made false promises to Ganske upon which he relied to his detriment in signing the Guaranty. Moreover, Hechler's about-face regarding the two agreements that he had represented would be drafted within days arguably gives rise to an inference that Boasher and Hechler's promises were made after they already haddetermined that they would not continue to sell product to Ganske or purchase his business. *Fed. Deposit Ins. Corp. v. Lauterbach*, 626 F.2d 1327, 1334 (7th Cir. 1980) (promise may be actionable where promisor has present intent not to perform).

As for Julie Ganske, she avers that she was induced to sign the Guaranty by Boasher's promise—relayed to her by her husband—that ECTUS would provide WSAG with a $1 million credit line in exchange for her signature, a claim Boasher flatly denies. This too is a factual dispute that cannot be resolved on summary judgment. Contrary to ECTUS's argument, the Ganskes' declarations about what Boasher allegedly said are not inadmissible merely because they are "self-serving." As the Seventh Circuit has made clear,

> *Everything* a litigant says in support of a claim is self-serving, whether the statement comes in a complaint, an affidavit, a deposition, or a trial. Yet self-serving statements are not necessarily false; they may be put to the test before being accepted, but they cannot be ignored.

*Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017).

Nor can the court ignore Julie Ganske's statements about what her husband told her on hearsay grounds. According to the Restatement (Second) of Torts sec. 531 (1976):

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

*See also Rendler v. Markos*, 154 Wis. 2d 420, 429, 453 N.W.2d 202, 206 (Ct. App. 1990) (complaint pleading negligent or intentional misrepresentation must allege that defendant misrepresented a fact to the plaintiff or to a third person with intent that it would be communicated to or influence the plaintiff) (citing *Puffer v. Welch*, 144 Wis. 506, 512, 129 N.W. 525, 527 (1911)). Thus, the fact that Boasher did not communicate directly with Julie Ganske but allowed Kent Ganske to act as an intermediary is not fatal to Julie's claim. Accepting the truth of the Ganskes' assertion, it is reasonable to infer that Boasher communicated his offer to Kent Ganske with reason to believe he would in turn communicate it to his wife, which is sufficient to make ECTUS liable to Julie Ganske for misrepresentation. And, like Kent Ganske's claim, the fact that Boasher (allegedly) reneged on his promise for no apparent reason suggests that he had no intent to keep it at the time he made it, giving rise at least to an inference of fraud.

That said, the Ganskes' claim that Julie reasonably relied on Boasher's promise of a one million dollar credit line seems to fly in the face of Kent Ganske's claim that Boasher and Hechler tricked him into signing the Guaranty just two months earlier by making false promises that they then reneged. If ECTUS had shown in March 2017 that it could not be taken at its word to provide product on a controlled consignment basis, then why would the Ganskes take

14

ECTUS at its word to provide product on ordinary credit just two months later?  There is no evidence that WSAG had paid off its debt to ECTUS in the meantime, or that the circumstances between the parties had changed in some way that would explain ECTUS's sudden change of heart.

It seems far more likely that Julie Ganske signed the Guaranty because WSAG was desperate for product and ECTUS would not provide it under any circumstance until the Guaranty was signed.  But deciding which side's story is more likely true is a task for trial, not summary judgment.  For now, there are material factual disputes concerning Julie Ganske's signing of the Guaranty that preclude the entry of summary judgment against her.

## II. Consideration

For their second defense to ECTUS's attempt to collect on the Guaranty, the Ganskes argue that the Guaranty fails for lack of consideration.  The first words of the Guaranty are, "For value received . . . ."  "The recitation of consideration in a guaranty raises 'a rebuttable presumption that consideration for the guaranty had in fact been given.'"  *Cicardo v. Van Der Molen*, 2009 WL 772846, *5 (W.D. Wis. 2009) (quoting *In re Estate of Mingesz v. Kieffer*, 70 Wis. 2d 734, 736, 235 N.W. 2d 296 (1975)).  Where, as here, a guaranty contains such language, the defendant has the burden of presenting facts to rebut the presumption that consideration was in fact given.  *Cicardo*, 2009 WL 772846, at *5.  This demands more than simply asserting that "no consideration was given."  *Id*.

Although defendants suggest in their introduction to their brief that both Kent and Julie Ganske are claiming lack of consideration, *see* Br. in Opp., dkt. 98, at 2, their arguments focus

only on Julie Ganske. *See id.*, at 12. Moreover, Kent Ganske admits that he was given consideration for his guaranty in the form of a continuation of credit. *Id.* (noting that ECTUS had "agreed to extend payments based on Mr. Ganske's signature."). Based on this admission, I find that Kent Ganske's lack-of-consideration claim fails.

The same is not true for Julie Ganske. As she points out, ECTUS had already agreed to extend credit upon receiving Kent Ganske's signature. Assuming– as I must–the truth of her assertion that she signed the Guaranty in exchange for Boasher's promise that ECTUS would provide a $1 million line of credit to WSAG but that the credit was never provided, then a reasonable fact finder could find that she received no consideration for her guarantee.

### III. Next Steps

In an order entered June 25, 2018, I granted Eurochem's motion to strike the jury demand with respect to Count IV of the amended complaint and the Ganskes' counterclaim, but held open the possibility of an advisory jury, especially if any third-party or non-collections claims also survive and proceed to a jury trial. Dkt. 59, at 11. It appears that the third-party claims are proceeding to trial. Even so, I have reconsidered how to proceed. My current intent is to hold a stand-alone bench trial on Claim IV and the counterclaims, starting on the Wednesday or Thursday before the Monday jury selection and trial on the other claims. This would spare the jury from having to make credibility determinations that are the court's sole province while sparing both sides' witnesses the need to travel to Madison on two different occasions. We can discuss this briefly at the August 16, 2019 telephonic motion hearing.

ORDER

IT IS ORDERED THAT the motion of plaintiff for partial summary judgment on Count IV of the Second Amended Complaint, dkt. 90, is DENIED.

Entered this 6th day of August, 2019.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge