EUROCHEM NORTH AMERICA CORP.
f/k/a/ EuroChem Trading USA Corporation,

                Plaintiff,

      v.

W. KENT GANSKE, individually and
d/b/a and sole proprietor of AG CONSULTANTS,
and JULIE L. GANSKE,

                Defendants.

                              OPINION AND ORDER

W. KENT GANSKE, individually and d/b/a AG
CONSULTANTS, and JULIE GANSKE,

                              18-cv-16-slc

      Counter-Plaintiffs and Third-Party Plaintiffs,
and

WS AG CENTER, INC.,

                Third-Party Plaintiffs,

      v.

EUROCHEM NORTH AMERICA CORP,
f/k/a/ Eurochem Trading USA Corporation,

                Plaintiff and Counter-Defendant,
and

EUROCHEM GROUP AG, SCOTT SIMON, IVAN
BOASHERLIEV, and EUROCHEM NORTH AMERICA
CORP., successor by merger to Ben-Trei Fertilizer
Company and successor by merger to Ben-Trie, Ltd.,

                Third-Party Defendants.

---

        This is a civil action for monetary relief in which plaintiff EuroChem North America

Corp. (formerly known as EuroChem Trading USA Corporation, referred to hereafter as

"ECTUS") alleges that defendants W. Kent Ganske and his wife, Julie Ganske, breached their

guaranties to plaintiff by failing to pay the indebtedness owed by their company, WS AG

Center, Inc. ("WSAG").  On October 21-22, 2019, this court held a bench trial on the Ganskes'

counterclaims that they were fraudulently induced into signing their guaranties and that Julie

Ganske's guaranty was not supported by adequate consideration.[1]  Having seen and heard the witnesses testify and having assessed their credibility, having reviewed the trial exhibits, and having considered the arguments made in the post-trial briefs, the court finds that the Ganskes have failed to establish that their guaranties are invalid because of fraud or lack of consideration. Accordingly, there being no dispute that WSAG owes ECTUS more than $14 million and that the Ganskes have failed to pay that debt, ECTUS is entitled to judgment on its breach of guaranty claims.

FACTS

## A.  The Parties

ECTUS is a wholesaler of fertilizer and other agricultural chemicals to customers in the United States and is a wholly-owned subsidiary of EuroChem Group AG ("EuroChem").  In 2016-17, EuroChem had four divisions:  mining, fertilizer, logistics, and marketing/sales.  The marketing/sales division of EuroChem was further divided into global geographic regions; ECTUS was the North American division.  From 2012-2017, Ivan Boasher was the president of ECTUS, and reported directly to Terje Bakken, head of EuroChem's marketing/sales division. Bakken, EuroChem's CEO Dmitry Strezhnev, and its CFO, Andre Ilyin, were considered EuroChem's "senior management" at that time.

WSAG is an agricultural product wholesaler and retailer owned by defendants W. Kent and Julie Ganske.  W. Kent Ganske also does business under a sole proprietorship known as AG Consultants.[2]

---

[1] The Ganskes also asserted a cause of action for violation of Wis. Stat. § 100.18, but they withdrew it before trial. Dkt. 198, at 5.

[2] Hereafter, I will refer to W. Kent Ganske as "Ganske" and Julie Ganske as "Julie Ganske."

2

**B.  The Debt and the Initial Payment Schedule**

Beginning in 2010, ECTUS and WSAG entered into a series of contracts for the sale of urea, phosphate and other products from ECTUS to WSAG.  Ganske dealt directly with Boasher and the two had a good business relationship for many years.  Typically, Boasher and Ganske would negotiate a purchase over the phone, and Lisa Smith, ECTUS's financial manager, would follow up with a written purchase order.  Boasher permitted Ganske to purchase product on credit.

In 2016, WSAG began falling behind on its payments.  By November 16, 2016, it had run up a debt of $21,486,951.44.  That month, Boasher, Smith, and Ganske worked out a payment schedule that, if followed, would have repaid WSAG's debt in full by May 31, 2017.  This was the agreed-upon schedule:

| | |
|---|---|
| November 30, 2016 | $2,032,576.79 |
| December 30, 2016 | $4,177,233.13 |
| January 31, 2017 | $ 912,486.60 |
| February 28, 2017 | $ 995,251.74 |
| March 31, 2017 | $3,113,867.71 |
| April 28, 2017 | $4,906,834.31 |
| May 31, 2017 | $5,348,701.16 |

Ganske made the first payment of $2,032,576.79 due on November 30, 2016, but he only paid $700,000 towards the $4,177,233.13 payment due in December.  In January 2017, Ganske paid the December deficiency and part of the payment due on January 31, 2017.  However, by late January 2017, WSAG and Ganske remained $600,000 behind schedule.

## C. January-February, 2017

In January 2017, WSAG's large debt came to the attention and concern of EuroChem's senior management. The senior management team decided to send in Marc Hechler, then head of finance and controlling for EuroChem's marketing/sales division, to assess the situation and to help Boasher resolve WSAG's large debt. As part of this assessment, ECTUS asked W. Kent Ganske to provide corporate and personal financial information to ECTUS for review. Meanwhile, it stopped shipping product to Ganske due to WSAG's non-payment.

On February 8-10, 2017, Hechler, Boasher and Smith traveled to Wisconsin to meet with Ganske. This was the first time Hechler met Ganske. The goals of the meeting were to gain an understanding of Ganske's business, assets, and liabilities, to find out why he had not been able to comply with the payment schedule he had agreed to in November, and, finally, to determine how he would repay the debt owed to ECTUS. Ganske, in turn, hoped to convince ECTUS, which had been supplying as much as 50% of Ganske's product, to extend WSAG additional credit and resume supplying product.

During the February meetings, Boasher and Hechler advised Ganske that EuroChem senior management was now involved in Ganske's account and would have to approve any future agreements. In fact, Smith expressly told Ganske during the February meetings that both she and Boasher had had their authority taken away from them. Boasher advised Ganske that EuroChem senior management had lost so much trust in him that they were concerned that Boasher and Ganske had conspired with one another to defraud EuroChem.

Ganske promised that he would get back on track with the payment schedule. Specifically, he promised to pay, within a couple of days, the $600,000 shortfall that he still owed for the January 31, 2017 payment, as well as the $995,251.74 payment due February 28,

2017. Boasher and Hechler impressed upon Ganske the need to make these payments as promised in order to gain trust with EuroChem's senior management. Hechler also told Ganske several times that ECTUS would not be able to grant him additional credit.

Ganske made the $600,000 payment on February 17, 2017, but failed to make the payment due February 28, 2017. Ganske emailed Boasher on February 28, promising that another $1 million would be coming "in the next 10 days or so," and that he was working on obtaining the financial information ECTUS sought. Ganske also indicated that he had a plan for repaying ECTUS in full, but he needed ECTUS's help to get through the season. Ganske remarked that it was "ridiculous" for Boasher's superiors to suspect that the two of them were "in cahoots." In spite of his promises, Ganske failed to pay ECTUS $1 million within 10 days.

At the February meeting, Hechler and Boasher had asked Ganske and his wife to sign a personal guaranty securing the WSAG debt. Ganske expressed his willingness to sign whatever documents were needed to assure EuroChem that he would make good on his debt. After the meeting, the parties' lawyers exchanged drafts of the guaranty and continued to discuss its importance. EuroChem was concerned that it had no security interest against Ganske in the event he should be unable to pay his very large debt.

### D. The Guaranty and the March 2017 Meeting

In addition to seeking a signed guaranty, ECTUS continued to seek financial information from Ganske. ECTUS deemed its receipt of this information crucial to understanding how WSAG had run up such a large debt, and whether WSAG and Ganske could repay it. Ganske provided some, but not all, of the financial information that ECTUS requested. Meanwhile,

Ganske continued to ask ECTUS to grant him further credit. ECTUS refused to extend additional credit to Ganske and it refused to resume selling any product to him at that time.

After Ganske failed to make the promised $995,000 payment on February 28, 2017, Boasher and Hechler traveled again to Wisconsin to meet with Ganske on March 7-8, 2017. Their agenda was to discuss the $995,000 payment, to obtain the Ganskes' personal guaranties, to gather additional information on Ganske's finances, and to explore possible solutions to secure repayment of the substantial debt owed to ECTUS.

During the March meetings, the parties discussed several different methods by which Ganske could repay the WSAG debt owed to ECTUS. One of the options discussed was a "controlled consignment" agreement through which a percentage of the profit would go towards retirement of the debt and other funds to Ganske, with the hope of keeping his business afloat through the spring so that it could be sold later in the year. (Ganske testified that he believed ECTUS was going to buy his company, but he admitted that he knew that any purchase of his business would have to be approved by EuroChem senior management.) Another option discussed was for ECTUS's subsidiary, Ben-Trei Fertilizer Company ("Ben-Trei"), to lease space in Ganske's terminals, which Ganske referred to as a "put-through" arrangement. The parties also outlined terms of a revised payment agreement.

The parties did not reach any final agreements during their March meetings. Boasher and Hechler made clear to Ganske that they did not have authority to enter into any agreements with Ganske and that final approval of any agreement would have to come from EuroChem's senior management. Boasher and Hechler also made clear that Ganske needed to sign the guaranty if he wanted ECTUS to continue to work with him to repay the debt.

Both parties were represented by counsel (via telephone) during these discussions. Ganske's lawyer, David Pelletier, asked that the guaranty be conditioned upon the execution of a formal agreement containing a repayment plan, and he proposed specific language to this effect. ECTUS rejected this proposal, insisting that the guaranty be signed without conditions given the size of the debt. At the same time, ECTUS assured Ganske that it would continue working towards a mutually-agreeable resolution to Ganske's debt situation.

Ganske signed the guaranty, without conditions, on March 8, 2017. It states, in relevant part:

> For value received, and to induce **EuroChem Trading USA Corporation** ("Creditor"), to continue credit accommodations to W S AG Center, Inc. and Agricultural Consultants (collectively, "Debtor"), the undersigned Guarantor jointly and severally guarantees payment of the Obligations defined below when due or, to the extent not prohibited by Law, at the time any Debtor becomes the subject of bankruptcy or other insolvency proceedings.

The guaranty contains an integration clause, which states:

> **ENTIRE AGREEMENT.** This Guaranty is intended by Guarantor and Creditor as a final expression of this Guaranty and as a complete and exclusive statement of it terms, there being no conditions to the full effectiveness of this Guaranty. This Guaranty may not be supplemented or modified except in writing.

In spite of being told that the guaranty would not be conditioned upon a written repayment plan or anything else, an hour or two after the meeting ended, Ganske sent the following email to Boasher and Hechler:

> I'm writing this as a follow up e-mail to our conversations over the past two days that led me to sign the personal guaranty today. I was reluctant to sign the guaranty, but based on your representations I was willing to sign with the understanding based on your promises that Eurochem will be providing me with a written agreement setting forth the details for WS Ag's payoff of

7

its indebtedness.  I was willing to provide the guaranty with the understanding Eurochem has agreed to provide WS the following payment terms:  $500,000 paid on or before 3/17/2017, $500,000 paid on or before 3/31/2017, the balance of $6,700,000 paid by 12/31/2017, $3 million of that paid in the fall months.  Also starting in July 2017 I would start consideration of the process of putting my business up for sale.

The remainder of $6,700,000 would be paid by 12/31/2018, with $1 million of that being paid by 7/31/2018.  At that time or anytime we would discuss selling some or all the assets of the company.  Also part two is your organization providing us product on a controlled, consignment basis that we outlined over the past day and today.  I understand I can expect a draft of these agreements on Friday.

This email had been ghost-written for Ganske by Attorney Pelletier.

In an email response sent later that day, Hechler agreed that Ganske's email "basically reflects" what the parties had discussed at their meetings.  Hechler further indicated that EuroChem intended to draft two separate agreements:  (1) a "'Master sales agreement' outlining the key principles of a controlled consignment agreement;" and (2) a "Memorandum of Understanding on the revised debt repayment plan including certain conditions we discussed regarding the asset sales process".  Hechler represented that EuroChem planned to have the first document prepared by Friday and the second by early the following week.

ECTUS resumed selling product on a prepayment basis to WSAG after Ganske signed the guaranty.  Hechler informed Ganske that ECTUS would not extend any additional credit to him and that any future purchases had to be prepaid.  Ganske did not make the payments to ECTUS that he proposed in his March 8 email.

## E. ECTUS Investigates Ganske's Financial Status

After the March 7-8 meeting, Hechler told EuroChem's senior management about the potential alternatives that had been discussed with Ganske, explaining that the parties had agreed "in principle" on a revised payment plan and a consignment agreement that would help to keep Ganske's business afloat through spring until he could begin selling assets in July 2017. Senior management responded that they would not approve any deals with Ganske until they had a full understanding of his finances and "where the money went," expressing concern that Ganske might have engaged in some fraudulent behavior.

On March 10, 2017, Hechler sent an email to Ganske stating that he had "had a first discussion with the Group CEO and CFO on the revised payment plan and concept on how to operate going forward," and that "management needs additional **up-to-date** information with regards to your current asset and liability situation." When Ganske responded that it would take him some time to pull together the requested information, Hechler advised that such information was "the only 'language' management understands" and that it was "highly critical to gain support."

In addition to seeking updated financials from Ganske, Boasher and Hechler asked Ganske to allow ECTUS to retain an outside accountant to review his companies' financial records, and Ganske agreed. ECTUS retained Avant Advisory Group to conduct the review. Hechler and Boasher joined Avant in Wisconsin in late March 2017 to review Ganske's records. On the first day of the meeting, Ganske provided a list of "customer prepayments" that showed approximately $23 million of previously undisclosed liabilities. Thereafter, Avant reported to EuroChem and ECTUS that it had found numerous financial irregularities in the way Ganske ran his businesses. In Avant's assessment, Ganske's liabilities exceeded his assets by $30 million.

## F. Julie Ganske's Execution of the Guaranty

ECTUS had wanted Julie Ganske to sign the guaranty during the early March meetings, but Ganske resisted. ECTUS acceded to Ganske's request that she not be required to sign at that time. However, after learning in late March that Ganske had previously-undisclosed liabilities of $23 million and questionable accounting practices, ECTUS had no trust in Ganske or his ability to repay the large amounts that he owed ECTUS. Accordingly, obtaining Julie Ganske's guarantee became a matter of renewed importance to ECTUS. On April 11, 2017, Hechler wrote to Boasher:

> Will call you later today on the point of additional mortgage on assets not yet encumbered. We should also try to get his wife's signature on the personal guarantee. But see no possibility to give him additional credit in return.

In response, Boasher wrote: "I'm not sure we can get the wife and additional assets pledged without throwing a bone." At trial, Boasher testified that by "throwing a bone," he meant extending credit.

On or about May 10, 2017, Ganske emailed Boasher a scanned copy of the guaranty, signed by Julie Ganske. Ganske's email says nothing about why his wife signed the guaranty. According to both Ganskes, however, she signed it because Boasher had told Kent Ganske that ECTUS would grant WSAG $1 million in credit if she did so. Julie Ganske's sole knowledge of Boasher's alleged promise of credit came from her husband; she did not speak to Boasher, Hechler, or anyone else at ECTUS or EuroChem before signing the guaranty.

Boasher forwarded the guaranty signed by Julie Ganske to Hechler, stating "see below." On May 11, 2017, Hechler sent the following email to Boasher:

> Forgot to mention: well done! Let's see what lawyers say on next steps planned. But I remain strictly against any credit (not even one hour), even though you may have to break a promise here.

Asked about this email at trial, neither Boasher nor Hechler could explain what Hechler meant by "breaking a promise." Boasher denied, however, that he had promised Ganske that ECTUS would give him credit. Boasher said the only promise he made to Ganske throughout this time period was that he would do his best to advocate on Ganske's behalf in front of the management team.

Julie Ganske testified that two days after she signed her guaranty, she learned from her husband that ECTUS had reneged on its promise. However, Kent Ganske never wrote or called ECTUS to complain about the denial of credit. Instead, he continued, without objection, to purchase product from ECTUS on a prepayment basis, making prepayments to ECTUS on May 12, May 16, May 17, May 18, May 22 and on into June.

Julie Ganske's signing of the guaranty rebuilt some of the trust Ganske/WSAG had lost with ECTUS as a result of Avant's review and the discovery of the undisclosed prepayments. ECTUS continued to work with Ganske towards an agreed resolution of the debt, negotiating with him until July 2017. At that time, after Ganske failed to sign a promissory note for the WSAG debt, ECTUS decided to take legal action. On July 13, 2017, ECTUS initiated arbitration proceedings against WSAG.

OPINION

## I. Fraudulent Inducement

To establish that they were fraudulently induced to execute their guarantees, the Ganskes bear the burden of proving by clear and convincing evidence that:

1)    ECTUS made a representation of fact;

2)    The representation of fact was false;

3)    The Ganskes believed and relied on the misrepresentation to their detriment or damage;

4)    The misrepresentation was made by ECTUS with knowledge that it was false, or recklessly without caring whether it was true or false; and,

5)    The misrepresentation was intended to deceive the Ganskes and to induce them to act on it to their detriment or damage.

*Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 13, 270 Wis.2d 146, 157, 677 N.W.2d 233 (contract fraudulently induced is void or voidable); *Daniel J. Hartwig Assocs., Inc. v. Kanner*, 913 F.2d 1213, 1222 (7th Cir. 1990). In addition, the Ganskes are required to show that their reliance on the misrepresentation was reasonable. *Larchmont Holdings, LLC v. North Shore Services, LLC*, 292 F. Supp. 3d 833, 854 (W.D. Wis. 2017); *Kailin v. Armstrong*, 2002 WI App 70 ¶ 31, 252 Wis.2d 676, 702, 643 N.W.2d 132, 146.

### A. W. Kent Ganske

Ganske contends that, in exchange for his signature on the guaranty, Boasher and Hechler agreed to the following: (1) ECTUS would deliver product on a consignment basis; (2)

ECTUS would revise the debt repayment schedule[3]; and (3) ECTUS (or EuroChem) would purchase Ganske's business. Ganske has failed to establish his claims by clear and convincing evidence.

### 1. Ganske Has Not Proved a False Representation

First, no final agreements were reached. Although the parties outlined broadly the terms of a controlled consignment agreement and a repayment schedule, numerous material terms remained open. For example, Ganske admitted that there was no agreement in writing regarding how much and at what price product would be sold under the controlled consignment agreement, and he contradicted himself regarding the amount that would go towards debt repayment (testifying first that it would be 100 percent, then saying it would be 95 percent). As for the repayment schedule, the parties had not determined, among other things, the source of repayment, time for repayment, interest rate, or trigger and method for a forced sale. Finally, Ganske acknowledged at trial that he knew that EuroChem senior management would ultimately have to approve the purchase of his company.

Second, no final agreements *could* be reached because neither Boasher nor Hechler had the authority to do so. Boasher and Hechler testified repeatedly that they made it clear to Ganske during the March 7-8 meetings that neither of them had authority to bind the company, and that everything they were discussing depended on the approval of EuroChem's upper management. I find their testimony to be credible and persuasive, and consistent with the emails introduced at trial.

---

[3] Although I already have held that this alleged misrepresentation was not actionable because it was interwoven with the guaranty, I will address it here for the sake of completeness.

Third, Ganske signed the Guaranty after ECTUS explicitly *rejected* his lawyer's proposal to make it contingent on execution of a formal agreement containing a repayment plan. In fact, ECTUS made clear to Ganske that their future business relationship hinged on him signing a personal guaranty *without* conditions, given the size of the debt and ECTUS's lack of any security interest. Given ECTUS's refusal to enter into any binding agreements as a condition for Ganske's signature on the guaranty, it is disingenuous at best for Ganske now to claim that he was tricked into believing such agreements were reached.

To rebut all of this evidence, Ganske relies on his self-serving email to Hechler and Boasher on March 8, and on Hechler's agreement that Ganske's email "basically reflected" what the parties discussed. I decline to afford this email string the weight that Ganske urges. As an initial matter, Ganske's email did not detail any specifics about a consignment agreement or sale of his company to ECTUS. This lack of detail bolsters ECTUS's position that no final agreements on these matters were reached.

More importantly, however, I reject the contention that Hechler's response should be viewed as an admission that ECTUS had made binding promises. Ganske's email strikes the court as laying the groundwork for a future fraudulent inducement claim in the event that ECTUS later would seek to enforce the guaranty. English is not Hechler's native language and he is not a lawyer. It is clear that he failed to recognize the snare Ganske was setting in his March 8 email. That's pretty much the way this all played out; unfortunately for Ganske, he signed an unconditional guaranty containing an integration clause that prohibits just such attempts.

Ganske also points to a post-meeting email from Hechler to his superiors at EuroChem, in which he explained that the parties had agreed on "key principles" on how to support Ganske's business and "agreed in principle" on a revised repayment plan. According to Ganske, this establishes that final agreements were reached and that Hechler was authorized to reach them. I disagree and find to the contrary.

Hechler explained that agreements were reached "in principle." This description belies the notion that anything final or binding had been achieved. Consistent with that understanding, Hechler also advised his superiors that ECTUS had refused to accept *any* conditions in exchange for Ganske's guaranty. These statements are entirely consistent with Hechler's testimony that he told Ganske that all proposals for resolving the debt situation discussed during their March 7-8 meetings would have to be presented to senior management for approval. The fact that Hechler may not have used specific words expressly seeking higher management's "review" or "approval" does not contradict his testimony (and Boasher's) that such approval was required. In fact, two days later, Hechler emailed Ganske, advising that he had presented the proposed agreements to the Group CEO and CFO, but that "management" had asked for additional financial information about Ganske's business before they would proceed. Ganske did not protest about upper management's involvement, or express surprise that their approval was needed, as would one have expected if Ganske actually thought that the parties had entered into binding agreements on March 8.

Finally, Ganske points to Boasher's statement at trial that Hechler was "the senior person from top management" involved in the negotiations with Ganske. This isolated reference does not contradict Boasher and Hechler's testimony that Hechler did not have final decision-making

authority and it does not contradict their testimony that they told Ganske this. Indeed, in an email to Ganske after the February meetings, on which Hechler was copied, Boasher wrote that they needed Ganske's financial information in order to present a report "to our top management." Hechler would not have been copied on this email if he was "top management."

In sum, I find that Boasher or Hechler did not make any false representations to Ganske in connection with his signing the guaranty. Ganske hasn't even met the preponderance standard on this point, let alone the higher standard required of him to establish fraud.

### 2. Kent Ganske's Claimed Reliance Would Not Have Been Reasonable

Even if the court were to assume, *arguendo*, that Ganske could establish false representations by Boasher or Hechler, any reliance by Ganske on such representations would not have been reasonable. "A plaintiff cannot justifiably rely on a misrepresentation while ignoring contradictory information that he or she knew or could have discovered." *Osowski v. Howard*, 2011 WI App 155, ¶ 27, 337 wis. 2d 736, 807 N.W. 2d 33 (unpublished opinion) (citing *Ritchie v. Clappier*, 109 Wis. 2d 399, 404, 326 N.W.2d 131 (Ct. App. 1982)). As Boasher, Hechler, and Smith testified, Ganske had been aware since February 2017 that Boasher no longer controlled his account and that decisions going forward had to come from the top of the house, and Ganske was told in March that nothing discussed was final until senior management had the chance to review and approve the plans. In light of this knowledge, Ganske could not have reasonably relied on the representations that he claims Boasher and Hechler had made to him.

### 3. Ganske Has Failed to Establish that Boasher or Hechler Had Fraudulent Intent

Finally, Ganske's misrepresentation claim fails because a misrepresentation must concern facts that exist at the time the party made a statement. *See Hartwig v. Bitter*, 29 Wis. 2d 653, 657, 139 N.W. 2d 644, 647 (1966). In other words, "an action for misrepresentation cannot be based on future events or facts not in existence when the representation was made, or on unfulfilled promises." *Schurmann v. Neau*, 2001 WI App 4, ¶ 10, 240 Wis.2d 719, 624 N.W.2d 157. The alleged promises to enter into a controlled consignment agreement, to provide a written repayment agreement, and to possibly purchase WSAG would be promises of things that would happen in the future, they were not present statements of fact.

Even so, a misrepresentation claim *could* lie if the party making the allegedly false statement "has a present intention not to perform" or "is aware of present facts incompatible with that [statement]." *Hartwig*, 29 Wis. 2d at 658, 139 N.W.2d 644; *see also* Restatement (Second) of Contracts § 159 cmt. c ("[A] promise or prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts."). But Ganske has not presented clear and convincing evidence of such awareness by Hechler or Boasher. Specifically, Ganske cannot show that at the time of the March 7-8 meetings, Hechler and Boasher had no intention of pursuing the plans discussed for restructuring the debt payments and keeping WSAG operating through the spring.

In fact, the evidence shows that they *did* so intend: the very same day Ganske signed the guaranty, Hechler wrote to his superiors and outlined the terms that had been discussed. In addition, the day after the March meeting, Hechler and Boasher were discussing the concept of

"put-throughs" with representatives of Ben-Trei, which was one of the possibilities they discussed to help ensure that Ganske's business remained a viable going concern through the spring months. Boasher and Hechler's actions after the March meetings contradict the contention that they had made any misrepresentations about their intentions. Accordingly, any alleged misrepresentations regarding future promises of a controlled consignment agreement, repayment agreement, or put-through agreement are not actionable as to fraudulent inducement.

### B.  Julie Ganske Has Not Established a False Representation

The Ganskes both testified that Julie Ganske signed the guaranty on May 10, 2017 because Boasher promised Kent Ganske that ECTUS would extend WSAG $1 million in credit if she signed, an assertion that Boasher denied.

I find that no promise of $ 1 million in credit was made. Boasher's testimony was credible, consistent, and supported by the contemporaneous evidence, whereas Kent Ganske's testimony was vague, inconsistent and incredible. Ganske's testimony is undermined by the following:

- his knowledge from previous conversations with Boasher and Hechler that credit was not an option and that Boasher no longer had final authority over Ganske's account;

- his implicit admission that Boasher did not give him an unconditional promise of credit, when he testified that Boasher had told him that he would not have an immediate answer on the credit because the "main people" in Russia were on vacation to celebrate a national holiday;

- Ganske continued to prepay for product without objection immediately after the supposed extension of credit;

- two weeks after Boasher allegedly reneged on his promise of credit, Ganske wrote to Boasher to confirm that he planned in the future "to deal

with your company in a very timely manner" and outlined his plans to sell some assets in order to pay his debt to ECTUS, but never mentioned Boasher's broken promise to provide a $1 million credit line; and

• Ganske never emailed or called ECTUS to complain that he was not provided the credit that Boasher had promised him.

To counter this evidence, the Ganskes point to Hechler's email to Boasher on May 11, 2017, in which he stated that he remained opposed to any extension of credit and that Boasher "may have to break a promise here." Noting that just a few weeks earlier Boasher had advised Hechler that it might be difficult to get Julie's signature without "throwing a bone" in the form of credit, the Ganskes urge the court to infer that the "promise" Hechler mentioned was a $ 1 million line of credit, and to reject Hechler and Boasher's testimony to the contrary.

I decline to do so. Although the Ganskes' interpretation of the evidence is not far-fetched, it is not persuasive enough to counter Boasher's direct denial that any promise of credit was made. As just noted, Boasher's testimony is corroborated by Ganske's silence in the days and weeks after Boasher allegedly broke his promise and his knowledge that Boasher no longer had final say on Ganske's account. Moreover, even if I were to assume for the sake of argument that Boasher did promise new credit–which to be clear, I find he did not–Ganske would not have been justified in relying on it because he knew that Boasher no longer was authorized to make such promises. Accordingly, the Ganskes have not established their fraud claim with respect to Julie Ganske's execution of the guaranty.

### III.    Julie Ganske Has Failed To Overcome the Presumption that There was Consideration for Her Guaranty

Finally, Julie Ganske argues that her Guaranty fails for lack of consideration.  Like other contracts, a guaranty is generally unenforceable unless supported by consideration.  *Luetzow v. Schubring*, 2007 WI App 183, ¶ 10, 304 Wis. 2d 635, 736 N.W.2d 543 (citations omitted) (unpublished disposition).  "When a guarantor is guaranteeing the payment of an existing indebtedness, 'there must be a new consideration moving either to the maker or the guarantor of a note, or to both, or a detriment to the payee of the note, in order to give validity to [the guaranty.]'"  *Cicardo v. Van Der Molen*, No. 08-CV-606-BBC, 2009 WL 772846, at *5 (W.D. Wis. Mar. 20, 2009) (quoting *In re Menzner's Estate v. Marathon County Bank*, 189 Wis. 340, 341, 207 N.W. 703 (1926)).  A "mere naked promise to pay the existing debt of another" is not sufficient proof of new consideration.  *Luetzow*, at ¶ 12, 304 Wis. 2d 635, 736 N.W. 2d 543 (citing 38 AM. JUR. 2d § 43 *Guaranty* (1999)).

Here, because Julie Ganske's guaranty contains a provision stating that it was given "for value received," consideration is presumed. *Cicardo*, 2009 WL 772846, at *5.  Nevertheless, argues ECTUS, there actually *was* consideration: in exchange for Julie Ganske's execution of the guaranty, ECTUS agreed to continue to forbear on initiating litigation to collect WSAG's debt, and to continue working with Kent Ganske to formulate a repayment plan.  In support, ECTUS points out that when asked whether Julie Ganske's guaranty affected how long ECTUS was willing to wait before taking any legal action, Hechler responded:

> It did certainly.  There was no more trust at the time.  And of course, with that signature, there was some trust regained, not a lot.  But still, I mean, it had a value for the overall relationship going forward.

Tr. 1-P-91: 1-4.  Furthermore, ECTUS continued to work with Ganske towards an agreed resolution of the debt: they continued to negotiate with him until July 2017 when, after Kent Ganske failed to sign a promissory note for the WSAG debt, ECTUS decided to initiate arbitration to collect on the debt.

The Ganskes don't dispute that an extension of the time of payment and forbearance from pressing a claim on the original debt is sufficient consideration for the promise of a guarantor.  *Luetzow*, at ¶ 12, 304 Wis. 2d 635, 736 N.W.2d 543; *In re Menzner's Estate*, 189 Wis. 340, 207 N.W. at 703.[4]  Nonetheless, the Ganskes argue, ECTUS never agreed to or even mentioned forbearance in exchange for Julie Ganske's signature.  In fact, they point out, Boasher insisted at trial that he made *no* promises to the Ganskes in exchange for Julie's guaranty.  As the Ganskes see it, this means that Julie's signature was merely a "naked promise" to pay the debts of WSAG, which is unenforceable.

I disagree.  Consideration need not be explicit; it can be inferred from the parties' dealings.  *Cal. Wine Ass'n v. Wis. Liquor Co. of Oshkosh*, 20 Wis. 2d 110, 122, 121 N.W. 2d 308 (1963) (consideration may be implied from parties' conduct)); *see also Phenix Nat. Bank of Providence v. Raia*, 68 R.I. 348, 28 A.2d 20, 22–23 (1942) (agreement between interested parties for forbearance may be either express or implied).  As ECTUS points out, by the time Julie Ganske signed the guaranty on May 10, 2017, W. Kent Ganske had:

- defaulted on the November 2016 payment schedule;

---

[4] W. Kent Ganske also asserted a lack of consideration defense, but I rejected this defense as a matter of law at summary judgment.  Op. and Ord., Aug. 6, 2019, dkt. 143, at 15-16.  The testimony at trial confirms that his guaranty was amply supported by consideration, namely, ECTUS's forbearance in seeking immediate collection on the debt, its willingness to explore ways to keep him in business for several months until assets could be sold, and its resumption of supplying him with product.

- failed to make the $995,000 payment due February 28, 2017 that he had promised to make;

- failed to make the $1 million payment he had promised to make within 10 days after he sent the February 28, 2017 email;

- failed to pay ECTUS $500,000 by March 17, 2017 and another $500,000 by March 31, 2017, as he had promised in the March 8 Meeting email;

- disclosed for the first time that he had $23 million in prepayment liability to his customers;

- and, at least according to Avant–whom ECTUS trusted– had liabilities that exceeded his assets by $30 million.

Based on this history, ECTUS had little, if any, faith in Ganske or in his ability to pay back his debts to ECTUS. It could have initiated arbitration at any time. Simultaneously, however, ECTUS was in an extremely vulnerable financial position given that the only security it had against WSAG was Kent's guaranty, which would be of limited value where private, jointly-owned assets were involved. Although Hechler testified that parties' relationship was not significantly altered as a result of Julie Ganske signing the guaranty, he did say that it earned WSAG some trust and bought it some time.

Contrary to the Ganskes' suggestion in their reply, it is sufficient consideration if the primary debtor (here, WSAG) received some benefit, even if Julie did not. *Menzner's Estate*, 189 Wis. 340, 207 N.W. at 703. Moreover, ECTUS need not have suffered a huge detriment in order for the guaranty to have been supported by adequate consideration; it is enough that it "performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obliged to perform." *First Wis. Nat. Bank of Milwaukee v Oby*, 52 Wis. 2d 1, 5-6, 188 N.W. 2d 454 (1971) (quoting 1 Williston, Contracts (3d ed.), pp. 375-380, secs. 102, 102A.)

Viewed in the context of the parties' relationship and dealings, I find that the parties understood that, if Julie Ganske executed the guaranty, ECTUS would continue to hold off on instituting legal action and would continue working cooperatively with Ganske to resolve WSAG's debt. And indeed, that is precisely what happened, until negotiations broke down in July 2017. Overall, I am satisfied that adequate consideration was given for Julie Ganske's guaranty.

## IV.    Conclusion

In sum, I find from the evidence at trial that the Ganskes have not proved their fraud claims, and Julie Ganske did not establish that she received no consideration for her guaranty. Accordingly, the Ganskes' guarantees both are valid and enforceable. ECTUS is entitled to judgment on its claim for breach of guaranty in the amount of $16,119,482.41, plus interest. Because the court has not yet decided the third-party claims, the court will not direct entry of final judgment at this time. *See* Fed. R. Civ. P. 54(b).

ORDER

IT IS ORDERED THAT:

1. Defendants and counter-plaintiffs W. Kent Ganske and Julie Ganske's counterclaims, dkt. 14, for fraudulent inducement (Count 1 and II), violation of Wis. Stat. § 100.18, (Count III), lack of consideration (Count VII), and punitive damages (Count VIII) are DISMISSED.

2. Plaintiff Eurochem North America Corp. (formerly known as EuroChem Trading USA Corporation), is entitled to judgment on Count VI of the second amended complaint, dkt. 31, against defendants W. Kent Ganske and Julie Ganske, jointly and severally, in the amount of $16,119,482.41, plus interest.

Entered this 30th day of December, 2019.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge