IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EUROCHEM NORTH AMERICA CORP.
f/k/a/ EuroChem Trading USA Corporation,

                    Plaintiff,

     v.

W. KENT GANSKE, individually and
d/b/a and sole proprietor of AG CONSULTANTS,
and JULIE L. GANSKE,

                    Defendants.

_____

W. KENT GANSKE, individually and d/b/a AG
CONSULTANTS, and JULIE GANSKE,

          Counter-Plaintiffs and Third-Party Plaintiffs,
and

WS AG CENTER, INC.,

                    Third-Party Plaintiffs,

     v.

EUROCHEM NORTH AMERICA CORP,
f/k/a/ Eurochem Trading USA Corporation,

                    Plaintiff and Counter-Defendant,
and

SCOTT SIMON, IVAN BOASHERLIEV, and
EUROCHEM NORTH AMERICA CORP., successor by
merger to Ben-Trei Fertilizer Company and successor by
merger to Ben-Trei, Ltd.,

                    Third-Party Defendants.

ORDER ON MOTIONS IN
LIMINE

18-cv-16-slc

_____

     This case is scheduled for a February 24 jury trial on a number of third-party claims

brought by Kent Ganske, his wife Julie Ganske, and their company, WS Ag Center, Inc., against

Eurochem North America Corp. and other individuals and entities associated with it.[1]

Specifically, the Ganske Parties are seeking damages based on the EuroChem Parties' alleged

_____

[1] Hereafter, I will refer to the third-party plaintiffs as "the Ganske Parties" and to the third-party
defendants as "the EuroChem Parties."

violations of (1) the Lanham Act; (2) the Defend Trade Secrets Act; (3) the Wisconsin Uniform Trade Secrets Act; (4) Tortious Interference With Business Interest; (5) Wis. Stat. § 134.01 Statutory Injury to Business Restraint of Trade; and (6) Defamation. (The Ganske Parties are no longer pursuing a handful of other claims asserted in their counter-complaint, namely Counts V, VII, VIII and X.) In a nutshell, the Ganske Parties claim that in early 2017, the EuroChem Parties tricked W. Kent Ganske into allowing an accountant, Patricia Aubort, to look at his company's books and records, from which she stole confidential business information and then provided it to the EuroChem Parties. They further allege that the EuroChem Parties then used this information to identify and contact the Ganske Parties' customers and vendors, offer them cheaper product, and communicate disparaging and untrue comments about Ganske and his companies, all in a deliberate attempt to ruin their business.

While these third-party claims have been pending, EuroChem and WSAG arbitrated EuroChem's claim that WSAG owed it more than $14 million in unpaid invoices for delivered product. Dkts. 70, 73. On March 6, 2019, the arbitrator issued his Final Award, awarding EuroChem $14,283,519.42 in compensatory damages; with prejudgment interest, attorneys' fees, and costs, the final award totaled $15,624,058.41. This court confirmed that award on July 8, 2019. Dkt. 125. Then, on December 30, 2019, following a bench trial, this court rejected Kent and Julie Ganskes' claim that their personal guarantees to pay WSAG's debt were void and unenforceable because of fraud and lack of consideration. Dkt. 226.

This order addresses the parties' motions in limine. *See* dkts. 230, 244, 249, 253, 257 and 277. Proposed voir dire questions, jury instructions, and special verdict forms will be provided to the parties in a separate order.

I.    **EuroChem Parties' Motion to Strike the Ganske Parties' Supplemental Rule 26(A)(1) Disclosures, dkt. 253, and Motion to Strike Trial Witnesses, dkt 277**

RULING:  GRANTED

A.  **Background**

EuroChem filed its complaint against Kent and Julie Ganske on January 8, 2018; the Ganskes and WSAG filed their Third Party Complaint against the EuroChem Parties on March 15, 2018.  On May 14, 2018, the parties exchanged their Initial Rule 26(a)(1) disclosures. Addressing Rule 26(a)(1)(A)(i)'s requirement that they disclose the name and address of individuals likely to have discoverable information, the Ganske Parties stated: "Any past or present customer, supplier or vendor of AG Consultants and/or WS AG Center, Inc., including but not limited to United Coop, Consumers Co-op," and "Any person or entity called or contacted by Scott Simon, EuroChem, Chalup, Attorney Richard, or any party on behalf of any EuroChem Company."  Dkt. 253, Ex. A, at 3.  According to the disclosure, these "individuals" were "expected to provide testimony regarding the facts, circumstances and events alleged in Defendants' Counter-Claims and Third-Party Complaint."  No individual names were provided. The address provided was the Ganske Parties' lawyer's office.

On December 10, 2019, the EuroChem Parties deposed Kent Ganske.  Ganske identified additional customers and vendors with whom he had a relationship that he claimed was harmed by the EuroChem Parties' conduct, but stated that it was a non-exhaustive list.  On December 10, 2019 and again on December 13, 2019, the EuroChem Parties asked the Ganske Parties for a list of the customers and vendors whom they planned to call as witnesses at trial so that EuroChem could depose them.  The Eurochem parties noted the approaching discovery cut-off on January 17, 2020.

A week later, on December 20, the Ganske Parties sent the EuroChem Parties a list of 29 companies that were vendors and customers of AG Consultants or WSAG, assuring them that they did not plan to call everyone, and that a narrowed-down list including names and contact information of specific individuals was forthcoming. EuroChem responded that the company names were not helpful; what it needed were the names of actual *people* at those companies. Two weeks passed without any response from the Ganske Parties.

On January 6, 2020, EuroChem *again* emailed the Ganske Parties and asked for the names; the Ganske Parties responded that they were working on it.

At 4:13 p.m. on Friday, January 17, 2020 – the very last day for pretrial discovery and twenty months after they served their first Rule 26(a)(1) disclosures – the Ganske Parties served Supplemental Rule 26(a)(1) Disclosures (the "Supplemental Disclosures"). They identified 31 individuals who are employed by customers or vendors of WSAG or AG Consultants to the list of persons who likely have discoverable information that they may use at trial. Ten days later, on January 27, the Ganske Parties filed their Trial Witness List, indicating that of the 31 newly-identified individuals, there are six they intend to call at trial and another five that they may call. Since that time, the Ganske Parties have narrowed their fact witnesses down to the following nine individuals: Cory Berg, Randy Sinai, Damien Girten, Dave Kramer, Kevin Toules, Steve Guetter, Dan Patee, Jim Berg, and Christina Ganske. With the exception of Christina Ganske, every person on the list is a representative from one of the Ganske Parties' customers or vendors whom the Ganske Parties claim were contacted by EuroChem during the alleged "smear campaign."

The EuroChem Parties now ask the court to strike all of these fact witnesses pursuant to Fed. R. Civ. P. 37(c)(1), on the ground that the Ganske Parties' amended 26(a)(1) disclosures, proffered at 4:13 p.m. on the last day of discovery, deprived the EuroChem Parties of the opportunity to depose these witnesses and thus has prejudiced their ability to defend themselves at trial.[2]

### B. Analysis

Federal Rule of Civil Procedure 26(a)(1) requires initial disclosures of: "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." "Rule 26(a)(1) disclosures are designed to accelerate the exchange of basic information and 'help focus the discovery that is needed, and facilitate preparation for trial or settlement.'" *Sender v. Mann*, 225 F.R.D. 645, 650 (D. Colo. 2004) (quoting Advisory Committee Notes to 1993 Amendments to Rule 26(a).) Under Federal Rule of Procedure 26(e), "[a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other Parties

---

[2] The EuroChem parties also seek to strike four expert witnesses on the Ganske parties Trial Witness list who were either never previously disclosed or were disclosed on the discovery cut-off date:  Claire Ann Richman, Brandon Finnie, Kerry Bean, and W. Kent Ganske.  In their response, the Ganske parties agree that they will not proffer W. Kent Ganske as an expert, and they say they named the other three witnesses only in response to what it says is improper expert testimony being proffered by EuroChem.  Dkt. 292. I address these witnesses where relevant below.

during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Rule 26(g) states that the attorney or party making disclosures pursuant to Rule 26(a)(1) must sign those disclosures, thereby certifying that "to the best of the signer's knowledge, information, and belief, formed after *a reasonable inquiry*, the disclosure is complete and correct as of the time it is made." *See* Fed. R. Civ. P. 26(g)(1) (emphasis added).

The Ganske Parties concede that none of the 9 individuals they seek to call at trial was identified in their initial Rule 26(a)(1) disclosures, but they deny they had any obligation to supplement. First, they suggest that their initial disclosures were adequate, repeating what seems to be their central theme: that the names of the various customers and vendors contacted by the EuroChem Parties were in the EuroChem Parties' possession.

This is just plain wrong. The EuroChem Parties had no obligation to attempt to ascertain the identity of the Ganske Parties' witnesses, much less indulge in the Ganske Parties' fallacious assumption that any contact between EuroChem and Ganske's customers and vendors necessarily involved disparaging statements that resulted in harm to Ganske's business. Rule 26(a)(1) requires the *disclosing party* to identify the subjects of the information that the disclosed individuals may offer to support that party's claims or defenses, and Rule 26(g) requires the *disclosing party* to make a reasonable inquiry. "If a party is unwilling to conduct a reasonable inquiry in advance of making Rule 26(a)(1) disclosures, that party cannot defeat the purposes of Rule 26(a)(1) simply by providing a laundry list of undifferentiated witnesses." *Sender*, 225 F.R.D. at 651. Here, the Ganskes did not even provide a "laundry list" of individuals. And insofar as the Ganskes protest that their disclosures were no less informative than disclosures provided by the EuroChem Parties, that argument is undermined by Rule 26(a)(1) itself, which

provides that "a party must make its initial disclosures based on the information then reasonably available to it and is not excused from making its disclosures . . . because it challenges the sufficiency of another party's disclosures."

Second, the Ganske Parties insist that the existence of the 9 witnesses was "otherwise made known" to EuroChem during the discovery process, thereby relieving the Ganske Parties of their obligation to supplement. In support, they cite to two sets of interrogatory answers that specifically named the witnesses who now are on their trial witness list as among those having knowledge about the misrepresentations made in this case. This list included Steve Guetter and Cory Berg, whom the Ganske Parties noted had previously filed affidavits in the case. As further proof that EuroChem knew who their witnesses were going to be, the Ganskes cite to Kent Ganske's December 10, 2019, deposition, where he named individuals at various companies with whom he did business who had been contacted by the EuroChem Parties.

Having reviewed these discovery materials, I conclude that they are not the "functional equivalent" of updated Rule 26(a)(1) disclosures. Rather, they reveal the blunderbuss approach that the Ganske Parties have taken since the outset of this case, by providing descriptions of witness testimony only in general terms, without differentiating who was told what, by whom, on what date, and by what means. At Ganske's December 10, 2019 deposition–taken more than 18 months after filing his third-party complaint and only 2½ months before trial–Ganske *still* struggled to identify all of the individuals whom he claims EuroChem spoke to that caused damage to his business. This was after being asked on several previous occasions to do provide these identifications. *See* Dep. of W. Kent Ganske, dkt. 262, at 20-24 (providing some names

but asserting that "[t]here's other ones, but I don't have that in front of me, so I can't – you know.").

More damaging to the Ganske Parties' "functional equivalent" argument is the fact that after Ganske's deposition, his counsel agreed to advise EuroChem "as soon as possible about any customers or vendors that you intend to call as witnesses at the trial" so that Eurochem's attorneys could depose them in the five weeks before discovery closed. Ganske's counsel did not respond by saying "you already know who we're calling" or by directing EuroChem's counsel to the Ganske Parties' discovery responses or to affidavits filed back in June 2018. Instead, he agreed to supply the information. About two weeks later, he emailed the names of 29 companies (not individuals) that were Ganske's customers and suppliers, but still assured EuroChem that the Ganske Parties would "clarify the list shortly, giving you the name and contact information for those individuals we do intend to call at trial." He did not provide that list until 4:13 p.m. on the last day of discovery.

The Ganske Parties offer no explanation for this last-minute disclosure, except to say they "were entitled to rely on the plain text of Rule 26(e) and the 1993 advisory committee notes and supplement with filed affidavits, interrogatory answers and deposition testimony." In making this argument, however, the Ganskes completely ignore the fact that they *agreed to provide EuroChem with a witness list*. It is patently duplicitous for the Ganske Parties now to assert that, in the face of this promise, the EuroChem Parties should have been combing through the discovery responses for names of individuals and proactively deposed them over the holidays "just in case" the list didn't arrive on time. *Even if* the Ganske Parties had a reasonable basis to think they had satisfied their Rule(e) requirements–which they do not–it was unfair and

unreasonable for them to promise their opponent a witness list, string it along for five weeks until discovery closed, and then glibly claim no foul because they allegedly had no obligation to produce the list in the first place. The Ganske Parties could not have believed in good faith that their last-minute disclosure of 31 new witnesses was appropriate.

Rule 37(c)(1) provides that where a party fails to provide information about a witness as required by Rule 26, courts should exclude that information and witness from consideration "unless the failure was substantially justified or is harmless." Whether a failure to comply with Rule 26(a) may be excused under Rule 37 is "left to the broad discretion of the district court," *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011), which may tailor any sanctions to the omission, *see Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). When applying Rule 37, courts consider: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Additionally, beyond any rule-based justification, the court has inherent authority to rectify abuses to the judicial process by imposing sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991).

I already have found that the Ganske Parties' actions were not substantially justified. I further find that these actions were not harmless. The trial starts in ten days and it will not be rescheduled. The final pretrial conference is in five days. The EuroChem Parties cannot possibly depose nine adverse trial witnesses at this juncture and it would be unfair, if not actually impossible for EuroChem to attempt to prepare to meet the testimony of the nine witnesses.

This case has been pending for nearly two years, the trial has already been re-scheduled once, and entry of judgment in favor of EuroChem on its guaranty claim is on hold until this trial is over.

Therefore, in accordance with Rule 37 and this court's inherent authority to manage its own docket, it is ORDERED that the EuroChem Parties' motion to strike the fact witnesses is GRANTED.

## II.     EuroChem Parties' Motion In Limine to Exclude Testimony Regarding Bona Fide Dispute of Debt, dkt. 257

### RULING:  GRANTED

At the court's direction, the Ganske Parties submitted a proffer of evidence and brief in support of their claims to the court on January 27, 2020.  The brief makes clear that, central to their claims under the Lanham Act, under Wis. Stat. § 134.01, for tortious interference, and for defamation is the Ganske Parties' contention that the debt owed by WSAG and the Ganskes (based on their personal guaranty) was the subject of a "bona fide dispute" as that term is defined in the involuntary bankruptcy statute, 11 U.S.C. § 303.  Therefore, contend the Ganske Parties, EuroChem "lacked standing" to file an involuntary bankruptcy petition against them, which means that the calls they made to WSAG's and Ganske's creditors seeking additional petitioners for the involuntary bankruptcy contained false statements.  *See* Proffer, dkt. 238, at 5-12; Br. in Opp., dkt. 294, at 17.

EuroChem asks the court to bar the Ganske Parties from offering evidence or making arguments that the debt owed to EuroChem was subject to a "bona fide dispute." The parties agree that a bona fide dispute exists if "there is an objective basis for either a factual or a legal dispute as to the validity of [the] debt."  *See Matter of Busick*, 831 F.2d 745, 749-50 (7th Cir.

1987), citing *In re Lough*, 57 B.R. 993, 997 (1986).[3] EuroChem argues that the validity of WSAG's debt has already been adjudicated in the arbitration proceeding, and the validity of the Ganskes' debt (by virtue of their personal guarantees) already has been adjudicated by this court at the bench trial. Therefore, argues EuroChem, the Ganske Parties' "bona fide dispute" theory is irrelevant, unduly prejudicial, and barred by the law of the case doctrine. *See also* Omnibus MIL, dkt. 249, at 6-9 (arguing that law of the case and collateral estoppel bar Ganske Parties from introducing evidence concerning facts previously adjudicated).

In response, the Ganske Parties acknowledge that they "may seek to enter evidence regarding facts that were in dispute in the arbitration and/or bench trial, but not for the purpose of attempting to relitigate or even prove the truth or falsity of those issues. Rather it is important to determine whether or not the trier of fact finds that there were bona fide disputes." Response to Omnibus MIL, dkt. 285, at 4. To use a concrete example, WSAG says it "will not claim that it is entitled to any offsets or credits against the amounts due under the contracts as a result of the arbitration finding, however, they will assert that WSAG had a bona fide dispute with regard to same as of the date ECTUS was lobbying for an involuntary bankruptcy." *Id*. at 5. Importantly, argue the Ganske Parties, the issue is not whether their objections to the validity of the debt were ultimately successful in arbitration or before this court, but rather whether the

---

[3] Although I agree with the Ganske Parties that this issue would have been better raised in a motion for summary judgment, it would not have been clear to the Eurochem Parties that this particular issue even was present. The Ganske Parties have not identified any statement in their counter-complaint or their discovery responses where they made clear that the EuroChem Parties' representations to the Ganske Parties' creditors about petitioning for involuntary bankruptcy were "false" because a "bona fide dispute" about the debt owed to EuroChem existed at the time the phone calls were made. As the excerpts they cite from their discovery responses make clear, the Ganske Parties asserted only that the EuroChem Parties falsely claimed they were going to "force the Ganske Parties into involuntary bankruptcy." *See* Response Br., dkt. 294, at 4-5. The term "bona fide dispute" never appears in these responses.

EuroChem parties were aware at the time they read the prepared statement that bona fide disputes existed.

I understand the distinction the Ganske Parties are making, at least on an intellectual level. On a practical level, however, there is no genuine distinction. The debt disputes were not bona fide at the time, as proved by the subsequent rulings from the arbitrator and this court. True, these rulings have no *nunc pro tunc* effect, but the fact that neither ruling had been entered yet does not render the Ganske Parties' objections to paying their debts objectively reasonable as a matter of fact or law. More to the point, these subsequent rulings show that there is no basis to require the Eurochem Parties to defend at the upcoming trial their view at the time that there was no bona fide dispute regarding the debts owned by the Eurochem parties. Subsequent events–namely, dispositive rulings by entities with the authority to make those rulings–proved the Eurochem Parties correct.

What the Ganske Parties want is the opportunity to re-present their evidence and let the jury second-guess these unfavorable rulings. In essence, the Ganske Parties want to ask the jury to predict what a bankruptcy court would have found if an involuntary petition actually been brought at the time the EuroChem parties were calling potential petitioning creditors. Allowing the Ganske Parties to travel this path would result in the *de facto* retrial of the validity of the underlying debt, the validity of the arbitration award and the correctness of this court's ruling in favor of EuroChem after the bench trial. That's not going to happen. As EuroChem correctly observes:

> [H]ad EuroChem and two other creditors filed an involuntary bankruptcy petition against WSAG and the Ganskes in late 2017 or early 2018 before the arbitration award was issued and the Bench Trial was held, the bankruptcy court would have simply held

> an evidentiary hearing to determine whether there was an objective basis for the validity of the debt. Given that the Ganske Parties' claims have been rejected by two adjudicatory forums– the arbitration proceeding and this Court – there is no basis to believe that the bankruptcy court would have held any differently than the arbitrator and this Court.

Dkt. 257, at 9.

Simply put, post-hoc events defeat any claim by the Ganske Parties that EuroChem was not a proper petitioning creditor when it made the calls. Therefore, the evidence that the Ganske parties want to introduce to show otherwise is irrelevant and inadmissible under Fed. R. Evid. 401. Moreover, even if this evidence were to have some marginal relevance, its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay. For that reason, I also am excluding it under Fed. R. Evid. 403.

III. **EuroChem Parties' Motion to Preclude the Ganske Parties From Providing Testimony or Other Evidence Regarding Facts or Issues that Have Already Been Established in the Arbitration or Bench Trial, dkt. 249 (Motion 1)**

Relying on the doctrines of the law of the case and collateral estoppel, the EuroChem Parties ask the court to prevent the Ganske Parties from introducing testimony or documentary evidence concerning 18 facts that they say were established in the arbitration or the bench trial. As a general matter, the Ganske Parties do not dispute that collateral estoppel/law of the case principles are in play as a result of the prior proceedings, but they object or seek caveats with respect to some of the specific facts that the EuroChem Parties are claiming to be off limits. Having considered the arguments from both sides, the court's ruling with respect to the 18 facts are as follows:

1.   WSAG and EuroChem entered into nine written contracts by which WSAG purchased products from EuroChem.

     **RULING:  GRANTED.**

2.-8.:  Various issues found by the Arbitrator.

     **RULING:  GRANTED**.  For reasons stated in the preceding section, the Ganske Parties' request that they be allowed to address these topics for purposes of establishing that WSAG had a bona fide debt dispute is DENIED.

9.   On or about November 16, 2016, WSAG entered into a payment schedule for repayment of over $21 million by May 31, 2017.

     **RULING:   GRANTED**, with the caveat that WSAG may present evidence showing that it made payments toward that amount and may explain why it fell behind in its payments.

10.  WSAG defaulted on the November 16, 2016 payment schedule in December, 2016.

     **RULING:   GRANTED**, with the same caveat as No. 9.

11.  EuroChem asked Kent Ganske to provide corporate and financial information for WSAG and AG Consultants in early 2017 because of the debt owed by WSAG and not because EuroChem was interested in purchasing WSAG and AG Consultants.

     **RULING:  DENIED.**  Kent Ganske may testify as to why he thought EuroChem was asking him for this information.

12.  The purpose of the February 8-10, 2017 meeting between Kent Ganske, Marc Hechler and Ivan Boasher was to discuss repayment of the debt owed by WSAG to EuroChem and not EuroChem's acquisition of WSAG and AG Consultants.

     **RULING:   GRANTED.**  *See* Order on Bench Trial, dkt. 226, at 4.

13. Marc Hechler and Ivan Boasher did not enter into an agreement with or promise Kent Ganske that EuroChem would enter into a "controlled consignment" agreement with him at their March 7-8, 2017 meeting.

   **RULING: GRANTED**. The Ganske Parties' request that Kent Ganske be permitted to share his contrary view for purposes of showing his debt was subject to a bona fide dispute is DENIED, for reasons previously stated.

14. Marc Hechler and Ivan Boasher did not enter into an agreement or promise Kent Ganske that EuroChem would enter into a revised repayment schedule for the debt owed by WSAG.

   **RULING: GRANTED.** The Ganske Parties' request that Kent Ganske be permitted to share his contrary view for purposes of showing his debt was subject to a bona fide dispute is DENIED, for reasons previously stated.

15. Kent Ganske was not fraudulently induced to sign his personal guaranty.

   **RULING: GRANTED**. The Ganske Parties' request that Kent Ganske be permitted to share his contrary view for purposes of showing his debt was subject to a bona fide dispute is DENIED, for reasons previously stated.

16. The outside accountant from Avant Advisory Group was hired by EuroChem to review AG Consultants and WSAG's books and financial records because EuroChem wanted full financial disclosure from them to determine whether they could repay the large WSAG debt. The outside accountant from Avant Advisory Group was not hired by EuroChem only to confirm that AG Consultants and WSAG had paid price protection to their customers.

   **RULING: GRANTED**. *See* Order on Bench Trial, dkt. 226, at 9.

17. Ivan Boasher did not promise Kent Ganske that EuroChem would extend him $1 million in additional credit if Julie Ganske signed a personal guaranty.

**RULING: GRANTED.** The Ganske Parties' request that Kent Ganske be permitted to share his contrary view for purposes of showing his debt was subject to a bona fide dispute is DENIED, for reasons previously stated.

18. Julie Ganske was not fraudulently induced to sign her personal guaranty.

   **RULING: GRANTED.** The Ganske Parties' request that Kent Ganske be permitted to share his contrary view for purposes of showing his debt was subject to a bona fide dispute is DENIED, for reasons previously stated.

IV. **EuroChem Parties' Motion to Prohibit Ganske Parties From Referring to the Beneficial Owner of EuroChem Group as a Russian "Oligarch" or to EuroChem Group as the "Mother Company," dkt. 249 (Motion 3)**

   **RULING: GRANTED**

Not only do the terms "oligarch" and "mother Russia" pander to anti-Russian sentiment and have the potential to prejudice the jury against the EuroChem Parties, but they have no probative value to the Ganske Parties.

V. **EuroChem Parties' Motion to Exclude the Expert Testimony of Michael Schwantes, dkt. 230**

   A. **Background**

The Ganske Parties have proffered Michael Schwantes, a business broker, as an expert to testify about his "business evaluation of WSAG and AG Consultants." In late 2016 or early 2017, Schwantes prepared a 25-page Confidential Business Review report at W. Kent Ganske's request, valuing the combined worth of Ganske's business at $36 million. (This report is Exhibit 6 to Schwantes' deposition, a copy of which is in the record at dkt. 230, Exhibit A.) Schwantes

updated the report in January 2018. (This report is Exhibit 5 to Schwantes' deposition, in the record at dkt. 230, Exhibit B.) The Ganske Parties want to introduce Schwantes' reports and testimony in support of their contention that, as a result of the Eurochem Parties' alleged misconduct, the Ganske Parties suffered "business devaluation" damages approximating $24 million. *See* Proffer, dkt. 238, at 29. The Ganske Parties seek to introduce Schwantes's report to show what their companies were worth "before" the smear campaign, compare that value to what they say the company is worth "after" the campaign (approximately $11 million), and then ask the jury to attribute the reduction in value entirely to the conduct of the third-party defendants. *See* Br. in Opp., dkt. 290, at 2.

The EuroChem Parties have moved to exclude Schwantes's testimony and report under Fed. R. of Evid. 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In support, they have submitted an affidavit from Dana Kaufman, a Certified Public Accountant and Certified Valuation Analyst, who has critiqued Schwantes's qualifications and methodology on numerous grounds. Dkt. 236. The Ganske Parties oppose the motion, they ask that Kaufman's affidavit be stricken on the ground that he is an undisclosed expert, and they have submitted a 15-page, 72 paragraph affidavit from Schwantes in which he defends his qualifications, conclusions and methodology. Dkt. 289-90.

In deciding this motion, I have not considered either Kaufman's *or* Schwantes's affidavits. I agree with the Ganske Parties that Kaufman is effectively a rebuttal expert, who was not previously disclosed under Fed. R. Civ. P. 26(a)(2)(D).[4] As for Schwantes, his affidavit

---

[4] In light of this ruling, the Ganske Parties have no need to call Brandon Finnie or Kerry Bean, whom they say they named as experts only to rebut Kaufman's affidavit. Dkt. 292, at 5. Accordingly, the EuroChem Parties' motion to strike these witnesses as previously-undisclosed experts is GRANTED.

testimony does not merely reply to Kaufman, but goes on to explain Schwantes's qualifications and methodology, not only supplementing his deposition testimony but in some instances deviating from it. For example, at his deposition, Schwantes testified that although he reviewed data from Ganske as it came in and had final approval authority over the report, the report was actually prepared by one of his employees (Sara Brittener), as discussed in more detail below. In his affidavit, however, Schwantes now claims that he was *directly* involved in the research and drafting of the report, he directed Brittener's research, and he relied upon data he knew to be from reliable sources in the valuation industry. Schwantes then proceeds to outline all the steps "he" went through to prepare the report, including what calculations were performed and what ratios were used based on subscribed databases. Dkt. 289, ¶¶ 46-60. Although Schwantes's more thorough description of his (or Brittener's) methodology is not necessarily a "sham," it would be unfair to consider it given the Eurochem Parties' inability to cross-examine him about it.

With that, I turn to the merits of the Eurochem Parties' *Daubert* motion:

## B. Analysis

Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court interpreted Rule 702 to require "the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). Thus, before admitting expert testimony, the court must evaluate three things: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original).

In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the expert's conclusions," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," *Daubert*, 509 U.S. at 595. The "soundness of the factual underpinnings" and "correctness of the expert's conclusions" may affect any ultimate determination on the merits, but do not govern admissibility. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718–19 (7th Cir. 2000). The expert must explain his or her methodology and cannot "simply assert a bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Finally, the expert "may be qualified by knowledge, skill, experience, training, or education." *See Smith*, 215 F.3d at 718 (internal quotation marks omitted). District courts have "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). As the proponent of Schwantes's

testimony, the Ganske Parties bear the burden of establishing its admissibility. *Gopalratnam*, 877 F.3d at 782.

### 1. Qualifications

The EuroChem Parties argue that Schwantes is not qualified because he is a business broker, not an appraiser or valuation expert. As they point out, he is not licensed or certified by any recognized appraisal or business valuation organizations, each of whom publish standards governing business valuations. Rather, Schwantes is a business broker who assists sellers in marketing their businesses to prospective purchasers. His formal education is in the field of restaurant and hotel management, not accounting or finance. He does not have specific training in certified valuation methodologies, apart from two, one-day classes that he took in order to become a "Certified Business Intermediary" from the International Business Brokers Association.

Still, as the Ganske Parties correctly point out, an expert can be qualified by experience. Schwantes has been a business broker for more than 40 years, during which time he has evaluated and sold numerous businesses and performed more than 1,000 business valuations. The Ganske Parties further argue that the EuroChem Parties' argument incorrectly assumes that only the methods used by certified business appraisers are reliable, and does not account for the fact that determining the value of property is an inherently inexact science.

Having reviewed the parties' competing arguments on this point, I conclude that Schwantes is qualified to render an opinion on the value of the Ganske Parties' business.

### 2. Reliability

When evaluating the reliability of a proffered expert's testimony, courts should consider the following non-exhaustive list of factors:

> (1) whether the proffered theory can be and has been tested;
>
> (2) whether the theory has been subjected to peer review;
>
> (3) whether the theory has been evaluated in light of potential rates of error;
>
> (4) whether the theory has been accepted in the relevant scientific community;
>
> (5) whether maintenance standards and controls exist;
>
> (6) whether the testimony relates to matters growing naturally and directly out of research the expert has conducted independent of the litigation, or developed expressly for purposes of testifying;
>
> (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
>
> (8) whether the expert has adequately accounted for obvious alternative explanations;
>
> (9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and
>
> (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Gopalratnam*, 877 F.3d at 779–80 (internal citations and quotations omitted). The reliability inquiry is flexible, however, and not all of these factors will apply in every case. *Id*. at 780; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). In most cases, the expert's testimony "must be grounded in an accepted body of learning or experience in the expert's field and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702 advisory committee's notes (2000 amendment).

There are a number of significant flaws in Schwantes's methodology.

As an initial matter, he did not actually prepare the report. It was prepared by one of his employees, Sara Brittener, who "does all of our valuations in-house." Schwantes Dep., dkt. 235, 40:12-41-:14. At his deposition, Schwantes testified as follows:

> Q. Now, I think I just heard you say I would have to kind of talk to my business valuation people. Did you create, personally create [the report]?
>
> A. I did not. I reviewed it upon its completion. I do not do the – I do not do the actual processing of the information. I review it when it's completed. And I review the information when it comes in the office, the tax returns and all of that.
>
> Q. Okay.
>
> A. And then it goes to our underwriting, if you want to call it that, for these kinds of documents.
>
>                            . . . . .
>
> Q. Sara Brittener would have –
>
> A. Yes, sir.
>
> Q. – prepared the reports, and then you would have reviewed them; is that correct?

Schwantes Dep., dkt. 235, at 40-41.


He also specifically denied that he supervised its production:

> Q. And the information that was prepared, did you review it and supervise its production?
>
> A. I didn't supervise its production. I reviewed all of the information when it came in. It goes to

> underwriting, and then I supervise the end product
> and review it.

*Id*. at 113.

As a result, any testimony Schwantes offered on the methodology used in preparing the report for the most part would be inadmissible hearsay. *Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc.*, No. 92 C 2394, 1996 WL 535083, at *4 (N.D. Ill. Sept. 17, 1996) ("Moreover, even though an evaluation report was evidently prepared by Geneva's evaluation business, [the proposed expert] did not prepare it—though he may have reviewed it—and cannot be properly cross-examined regarding its preparation. With [the expert] on the stand, the evaluation report is nothing more than hearsay.").

Second, Schwantes freely admitted at his deposition that he was not retained to provide an independent evaluation of WSAG's value. Rather, his report was prepared in order to put WSAG in the best possible light in order to maximize its value to potential buyers. He admitted that his report was *not* an appraisal, but rather was "an estimate of value for marketing purposes." Schwantes Dep., dkt. 235, at 39:17-40:8. Thus, Schwantes did not evaluate WSAG's value as a neutral, independent evaluator would, but rather used the data provided to him for the express purpose of producing a report tilted in favor of a high value, to be directed to the highest and most strategic buyer.

Third, and most concerning, the Ganske Parties have failed to establish that the actual methods Schwantes (or Brittener) used to arrive at his final estimate of value are reliable. Schwantes used three different income approaches: (1) a multiple of seller's discretionary income ("SDE"); (2) a multiple of earnings before interest, taxes, depreciation, and amortization

("EBITDA);"and (3) a multiple of gross revenue. In the case of his valuation of Agricultural Consultants, these approaches yielded values of (1) $1,774,929, (2) $1,636,286, and (3) $37,952,249, respectively. He then took the average of the three figures to arrive at his final estimate of value.

There are two key flaws in this approach. First, although Schwantes acknowledged that it is appropriate to discard an errant valuation, he had no explanation for giving equal weight to the third value, which was more than 20 times greater than the other two values produced by different methods. Second, even though Schwantes acknowledged that AG Consultants was only showing a net profit on gross revenues of less than 1 percent (<0.01), he applied a multiplier of 0.65 to gross revenue to arrive at the $37,952,249 figure. But Schwantes could not offer a good reason for using the 0.65 multiplier (or any of the other multipliers he used in his report), except to say that it was generated by a third-party cloud-based database that Brittener used in preparing her report. Having not prepared the report, he could not confirm what parameters Brittener inputted that produced the multiple. And, critically, Schwantes did not know on what data the software program relied to generate the 0.65 multiplier (or the other multiples that were used in arriving at value.) Schwantes simply presumed the figure was reliable.[5]

In light of these flaws, the Ganske Parties have failed to meet their burden to show that Schwantes used a sound and reliable methodology in valuing WSAG and Ag Consultants. Accordingly, his testimony is inadmissible.

---

[5] In his post-hoc affidavit, Schwantes attempts to fill in this gap, asserting that the information gathered from Brittener was from "sources that I know to be reliable and the information that we gathered is of a type reasonably relied upon by experts in my field in forming opinions on the subject of valuation." Dkt. 289, at ¶24. Even if I were to consider his affidavit, Schwantes' say-so is not enough to establish the reliability of his data.

### 3. Relevance

Even if Schwantes could testify as an expert, I have serious concerns whether his testimony would be relevant. To qualify as "relevant" under Rule 702, an opinion must assist the jury in determining a fact at issue in the case. *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000). The alleged "fact at issue" that the Ganske Parties want to establish through Schwantes' business report is the "before" portion of their before-and-after theory of damages. Fair enough. But what the court has not seen is any evidence or testimony that attempts to account in any fashion or degree for other factors that could be responsible for the Ganske Parties' business losses, such as changes in market conditions or other factors entirely unrelated to any alleged disparagement by EuroChem.

Although a plaintiff need not prove his damages with precision, a valid damages model in a case alleging unfair business competition must account for factors *not* attributable to the defendants' misconduct that might have caused the plaintiff's financial losses. *Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–16 (7th Cir. 1992) ("The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor...from the damages that resulted from particular forms of misconduct allegedly committed by that competitor...."); *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) ("We do not allow antitrust plaintiffs *or any other plaintiffs* to obtain damage awards without proving what compensable damages were actually suffered as a result of the

defendant's unlawful conduct.") (emphasis added).  As the Court of Appeals for the Seventh Circuit explained in *Isaksen*, a simple before-and-after theory is too imprecise:

> Although Isaksen may well have suffered losses during the period of Vermont Castings' unlawful activity, he made no effort to establish how much of the loss was due to that activity as distinct from unrelated business factors . . . All Isaksen did to prove damages was to compare his average profits for several years before and several years during the period of unlawful activity. *Post hoc ergo propter hoc* is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work.

825 F.2d at 1165.

"[P]eople who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *Schiller*, 969 F.2d at 415.  Here, the Ganske Parties have proffered no expert opinion or – from what the court has seen so far – other evidence that purports to establish how much the purported decline in the value of their business was attributable to the EuroChem Parties' alleged unlawful activity.  Instead, they contend that *the entire decline* in the value of their business is attributable to the third party-defendants' smear campaign.  This contention is untenable, not just as a matter of common sense but under the particular facts of this case.  Just to cite one example, this court has already determined that *before* the alleged smear campaign began, the Ganske Parties had $23 million in customer liabilities and WSAG owed Eurochem millions more.  Not only did Schwantes fail to account for these debts in his valuation, but they show that Ganske and WSAG were having financial problems long before the alleged bad-mouthing by EuroChem.

Accordingly, unless the Ganske Parties have evidence of causation of which the court is not aware, their proposed "business devaluation" model would invite the jury to engage in speculation and provide it with no reasoned basis on which to award damages.  Insofar as

Schwantes's testimony would be used as the starting point for what is itself a flawed methodology, it offers no assistance to the jury. For that reason, in addition to the other problems identified above, it is both misleading and irrelevant.

VI.    **EuroChem Parties' Motion to Preclude Marc Farmer and Carolyn Bauman From Offering an Opinion of the Value of WSAG or AG Consultants' Businesses, dkt. 249 (Motion 2)**

   RULING:  GRANTED.

The Ganske Parties have named Marc Farmer, CPA, and Carolyn Bauman as "non-retained" potential expert witnesses under Fed. R. Civ. P. 26(a)(2). They identified Farmer and Bauman as offering expert testimony regarding past accounting services provided to WSAG and "the value of the business, including goodwill of Defendants and Third-Party Plaintiffs." The EuroChem parties argue that neither Farmer nor Bauman should be permitted to offer an opinion of the value of WSAG or AG Consultants' business because: (1) the Ganske Parties failed to comply with Rule 26(a)(2)(C)(ii) by failing to disclose any "summary of the facts and opinions" to which Farmer and Bauman were expected to testify; and (2) neither is qualified to offer such an opinion. The Ganske Parties assert that they do not intend to present Bauman as a valuation expert, but maintain that they should be allowed to call Farmer.

I agree that Farmer cannot offer expert testimony because the Ganske Parties never disclosed a summary of the facts and opinions to which he would testify. All they ever said about the substance of Farmer's testimony is that he would provide expert testimony "regarding the value of the business, including goodwill of Defendants and Third-Party plaintiffs." This may have fulfilled Rule 26(a)(2)(C)(i)'s requirement that the expert disclose the *subject matter* on

which he was expected to testify, but it is not the summary of facts and opinions required by subsection (ii).  Although a non-retained expert need not produce a report nearly as detailed as those demanded of retained experts, he must at least briefly summarize his opinions and outline the facts he relied on.  Farmer never did.  EuroChem might have retained a rebuttal expert had they known Farmer was going to opine that the Ganske's companies were worth $40 million.  *Kazmierski v. Bonafide Safe & Lock, Inc.*, No. CV 15-C-0059, 2015 WL 10070324, at *2 (E.D. Wis. Dec. 11, 2015) ("To constitute a 'summary' of 'facts and opinions,' a disclosure must at least identify the opinions and some facts that relate to them, so that the defendant can decide whether to take the physician's deposition or to retain an expert to rebut his opinions.").

The Ganske Parties point to an affidavit that Farmer filed in May 2018, but that affidavit only describes Farmer's lay witness observations in his role as CPA for WSAG.  *See* Dkt. 48.  They also say that they disclosed the facts underlying Farmer's expected testimony when they attached a copy of Schwantes' report to their January 18, 2019 expert disclosures.  But that disclosure – in which Schwantes was *also* named as an expert-- makes no suggestion that *Farmer* relied on Schwantes' report.  *See* dkt. 285-4, at 3-4.  Finally, insofar as the Ganske Parties' contend that Farmer relied on Schwantes's report in forming his opinions, the court's ruling that Schwantes's report is inadmissible would also preclude Farmer from offering testimony about it.


VII.    **The Ganske Parties' Motion to Preclude Steven Wirth and Patricia Aubort From Offering Expert Testimony, dkt. 244**

RULING:  **DENIED as unnecessary**

Steven Wirth is the lawyer who drafted the "Prepared Statement" about involuntary bankruptcy, described above.  Patricia Aubort is the accountant who was retained by EuroChem

28

in 2017 to review the Ganske Parties' books and financial records. According to the Ganske Parties, each of these witnesses offered testimony at his or her deposition that constitutes expert testimony: Wirth on the requirements of an involuntary bankruptcy petition, and Aubort regarding "certain financial practices of WSAG." The Ganske Parties argue that, because EuroChem failed to designate either of these witnesses as an expert witness, their testimony on these topics must be excluded.

The EuroChem Parties respond that although Wirth and Aubort may be highly qualified in their chosen fields, in this case they are fact witnesses, not expert witnesses. *See United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012) (explaining that "the Rules do not distinguish between expert and lay *witnesses*, but rather between expert and lay testimony."). Specifically, they note that at his deposition, Wirth explained what an involuntary bankruptcy is and what section of the code applies when he was asked whether all of the statements in his prepared script were truthful. I agree that this is lay testimony, not expert testimony. In any case, in light of the court's previous ruling barring the Ganske Parties from presenting their "lack of standing/bona fide debt dispute" theory, it seems questionable that any testimony about his role in preparing the script would be necessary or even relevant.[6]

Aubort, too, is a fact witness. She has first-hand knowledge of some of the events at issue in this lawsuit. However, if her testimony veers into the prohibited territory of expert opinion, then the court will rule on the admissibility of such testimony at the appropriate time.

---

[6] Because it is plain that if Wirth does testify, he does not intend to offer an expert opinion, the Ganske Parties have no basis to call Claire Ann Richman in rebuttal. Accordingly, the EuroChem Parties' Motion to strike Richman as a previously-undisclosed expert witness is GRANTED.

Entered this 14th day of February, 2020.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge